[Civ. No. 9247.   Third Dist.   June 6, 1958.]

Estate of FREDERICK ARTHUR KIRK, Deceased. ADE-
LINE KIRK et al., Appellants, v. CHARLES ELLS-
WORTH KIRK et al., Respondents.

Pierce Deasy for Appellants.

Gard Chisholm for Respondents.

PEEK, J.—This is an appeal by proponents Adeline Kirk,
L. P. Gebhardt, Jess Leach and Vesta Leach of the will of
Frederick Kirk, deceased, from a judgment entered denying
probate thereof.   The judgment was entered pursuant to a
special verdict of the jury finding that Frederick was induced
to sign the proposed will by means of the undue influence of
Phil Gebhardt, and that Frederick, at the time of said execu-
tion, was not of sound and disposing mind.   The proponents
contend that the findings of undue influence and mental in-
competency are not supported by the evidence.   Necessarily,
therefore, if the conclusion of the jury can be supported on
either ground, the judgment must be sustained.   Since it ap-

pears that the evidence upon the question of competency amply supports the judgment, we shall limit this opinion solely to that issue.

The testator executed the contested will on August 3, 1950. He died on April 15, 1956, at the age of 78 years, survived by two sons—Charles Ellsworth Kirk and Oscar Kirk, the contestants.

At the time the will was executed, as at the time of his death, the decedent was the owner of real property in Amador County consisting of the Mount Echo Ranch containing about 316 acres; the Lane Place, about 133 acres; the Glascock Place, about 45 acres; the Ruggles Ranch, about 480 acres; and a home place in Ione, about one-half block.

By the contested will of August 3, 1950, he gave the Lane Place to his sister-in-law, Adeline Kirk; the Mount Echo Ranch and the home place in Ione to Adeline Kirk and his brother, Charles H. Kirk, who died in 1952; the Glascock Place to the children of his son Ellsworth—Dulcy and Rodney —and their mother, Betty; $500 to Phil Gebhardt; $100 each to Jess Leach and his wife, Vesta; and the residue to those specifically remembered in the will. Adeline Kirk was named the executrix.

Paragraph IX of the will provided in part as follows: "I have two sons now living, Ellsworth Kirk and Oscar Kirk. I specifically and with premeditation leave each of them nothing. My son, Ellsworth, for a long number of years has failed to give to me any filial or other respect, attention, love or affection and it has been necessary for me, through my friends, to have had my son Ellsworth removed as my Guardian because of his lack of attention to me either as Guardian or son. My son, Oscar, treats me as a stranger and has never at any time displayed toward me any affection or respect."

Pursuant to a petition filed on November 5, 1942, by Frederick's brother, Charles, Frederick was adjudged a mentally ill person and ordered committed for placement in the Stockton State Hospital. Frederick was a patient in the hospital until September, 1944, when he was granted a leave of absence. He was issued a certificate of recovery in 1945. Frederick was examined again on September 29, 1948, and would have been issued a certificate of recovery on that date had not one already been issued to him. The conclusion of the medical examiners at the time of his admission to the hospital was that decedent was "mentally confused." Both of the doctors who signed the report died prior to the trial. The later official

diagnosis of the hospital staff was ''psychosis with cerebral arteriosclerosis and alcoholism.''

Upon his petition, Ellsworth was appointed guardian of the person and estate of his father on December 4, 1942, and remained guardian until May, 1950. The petition of Frederick's brother, Charles, that Ellsworth be removed as Frederick's guardian and that Phil Gebhardt be appointed the guardian of the person and estate of Frederick was granted on May 15, 1950. Gebhardt assisted Frederick's brother, Charles, in the preparation of the petition for the removal of Ellsworth as guardian. In that proceeding Gebhardt filed an affidavit wherein he alleged it was necessary for someone to ''care for the person and manage the property of said incompetent,'' and in a subsequent proceeding alleged that ''the person and estate of the said Frederick Kirk was and is endangered and subject to damage and loss unless a special guardian were not therein appointed.'' Thereafter, during the course of the present trial and in answer to questioning by contestants' counsel, Gebhardt admitted that he thought Frederick ''wasn't right'' and that ''he couldn't look after his property.'' Gebhardt was Frederick's guardian until July 28, 1951. From that time until his death the Bank of America was the guardian of the estate of Frederick but there was no guardian of his person until Ellsworth was appointed in 1955.

Decedent resided at what is referred to as the home place in Ione all his life. He married in 1902; Oscar was born in 1904 and Ellsworth in 1908. In 1913 Frederick and his wife separated and were subsequently divorced. After the separation Ellsworth and his mother moved to Oakland and Oscar lived with his father in Ione. Ellsworth spent school vacations with his father. He lived in the East from 1927 or 1929 until 1939 and saw his father every two or three years during that time. He returned to the West in 1940. From 1933 on Oscar was employed as a warehouseman in a cannery in Oakland and lived in that city. He saw his father about twice a month during the winter months except when he was in the Army in 1942-1943, and spent a week or 10 days with him during the holidays. During the years 1944 through 1950 Oscar visited his father twice a month in the winter season but was not able to go to Ione during the busy season at the cannery. Oscar took foodstuffs from the cannery to his father and remembered him with Christmas gifts. He gave his father an overcoat for Christmas in 1952 or 1953.

Gebhardt testified under section 2055 of the Code of Civil Procedure that Frederick cared for his family and told him on numerous occasions and up to the time of his death that he (Frederick) "thought the world of Oscar."

Ellsworth testified that from 1944 until his father's death, there had been a normal father-son relationship between them and he knew of no ill feeling that his father had toward him. He said further that when his father testified during the guardianship proceedings in April, 1950, in answer to the court's question whether or not he had any ill feeling toward Oscar or Ellsworth, he said, "No, none whatever. We are getting along fine."

Oscar testified that one time, the exact date he did not recall, he asked his father if he had made a will. His father replied that ". . . he wasn't interested in a will at all. All he wanted to do was to leave it in the family."

Frederick's former wife testified that in July, 1955, she asked him, "Have you drawn a will?" He answered, "You know I never would draw a will. I ain't got no faith in them." She also testified that in her opinion he was not competent to make a will on August 3, 1950; that he could not carry on a conversation and could not talk rationally.

Ellsworth testified further that from the time his father returned from the hospital until he died his mental and physical condition gradually deteriorated; that he did not bathe, change his extremely dirty garments, shave or get his hair cut and resented anyone trying to persuade him to do these things; that he was somewhat rambling in conversation and dwelt upon events 30 or 40 years in the past; that he had a disorganized garden which was in spots over the lot and over established paths; that he stuck a pole in the ground and cultivated any weed or "sucker" from a tree; that he planted thistles; that he used green limbs and leaves to start a fire in a wood stove in his cabin when the firewood was available; and that he dipped drainage from the septic tank and poured it on his vegetables. He further testified that at least twice a year until his death his father said that Oscar had a spot on his lung and was going to be discharged from the service; that during that time Oscar had visited him on a number of occasions; that from 1944 through 1946 he sprinkled water on the premises when it was raining; that he ascertained the day of the week from the newspaper and then asked for the newspaper again to find out what day of the week it was; that during the winter he wore bedroom slippers outside when it

was raining and muddy, and during the summer wore high laced boots inside; that he wore shoes that were not mates; that he refused to have facilities for water installed inside the cabin; that at times he eliminated in the storeroom in the barn in preference to toilet facilities in the five-room house or an outside privy; that in August or September, 1955, he took a check and a letter from the glove compartment of Ellsworth's car.

· A neighbor, Rose Bell, testified that after Frederick returned from the hospital he set fires indiscriminately—adjacent to fences, houses and other buildings; that he took effluent from a septic tank and spread this upon his garden; that he dug thistles and horehound from her yard and planted them in his; and that he sprinkled water when it was raining. She also testified that from the time he returned from the hospital until his death he would proceed up and down the street in the vicinity of his house and look into vehicles parked there; that in 1951 he took a cattle pen sign from a sales yard at an auction in Galt; that from the time he returned from the hospital until his death he got gradually worse; and that in 1950 ". . . his mind and everything was worse. He just simply didn't know what he was doing part of the time."

· Sam Hawkins who, with his family, was a tenant of Frederick during 1946-48 testified that during that period of time Frederick poured sewer water which he called "fire water" over the witness's vegetable garden; that Hawkins found human excrement stored in the barn in tobacco cans which had contained the brand Frederick used.

Doctor Freeman H. Adams, who was superintendent of the Stockton State Hospital and acting superintendent of Modesto State Hospital at the time of the trial, stated that psychosis with cerebral arteriosclerosis means there was a loss of the higher centers because of poor blood supply or insufficient nutrition to the brain; that the disorder is generally considered permanent, irreversible and progressive. It interferes with a person's ability to see things clearly. The patient's personal appearance very often suffers as do his memory and his ability to know exactly his surroundings. He becomes careless and does not take care of his personal needs. Doctor Rudolf B. Toller, who had been superintendent of Stockton State Hospital during a portion of decedent's commitment, stated that this illness causes a dying-out or destruction of certain brain cells and is progressive in nature. A person suffering from this illness may have lucid moments. Periods

of lucidity vary as to the amount of progress the disease has made. In their opinions Frederick Kirk, on August 3, 1950, was not able to satisfy the well-established elements of testamentary capacity. (See *Estate of Smith,* 200 Cal. 152, 158 [252 P. 325].) Their opinions were based upon hypothetical questions which took into consideration the decedent's medical records and the previously summarized facts.

■ The province of a reviewing court in a will contest is the same as in any other civil action. (*Estate of Teel,* 25 Cal.2d 520 [154 P.2d 384]; *Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689].) Necessarily, therefore, appellants' contentions which are essentially a reargument of the weight and sufficiency of the evidence are without merit. While it is true that much of the evidence was in conflict, to review those conflicts is not the province of this court.

Equally without merit is appellants' further contention that the evidence, particularly in regard to the testimony of the two medical experts, is too remote in point of time. ■ "Proof of the sanity of the testator and of the facts upon which his state of mind depends are not necessarily confined to the exact time of the execution of the will. Evidence of the testator's mental status, together with his appearance, conduct, acts, habits and conversation, both before and after the execution of the will, are admissible so long as they have a reasonable tendency to indicate his mental condition at the time of the execution of the will. Its weight was for the jury to determine. [Citations.] This is particularly true when the characteristics of the malady indicate a permanent and progressing mental disease." (*Estate of Hartley,* 137 Cal.App. 630, 633 [31 P.2d 240].) The evidence produced by the contestants comes squarely within the rule enunciated in the case above quoted.

Since it cannot be said that such evidence was insufficient, as a matter of law, the judgment must be affirmed.

The judgment is affirmed.

Van Dyke, P. J., and Schottky, J., concurred.