196 Cal.App.2d 268 (1961)
Estate of JOHN EDWARD CALWAY, Deceased. RAE MOOREHEAD et al., Contestants and Respondents,
v.
OPAL POPE, Defendant and Appellant.
Civ. No. 19414. 
California Court of Appeals. First Dist., Div. Two. 
Oct. 13, 1961.
 Machado, Feeley & Machado and John H. Machado for Appellant.
 Haley, McInerney & Logan, Richard G. Logan and Ernest Rusconi for Respondents.
 KAUFMAN, P. J.
 This is an appeal by Opal Pope, the proponent of the will of John Edward Calway, deceased, from a judgment denying probate thereof. The judgment *270 was entered pursuant to a special verdict of the jury finding that the decedent was induced to sign the proposed will by means of the undue influence of Opal Pope, and that the decedent, at the time of said execution, was not of sound and disposing mind. The appellant contends that the findings of undue influence and mental incompetency are not supported by the evidence, and that the trial court committed prejudicial error in the admission of certain evidence and in the instructions to the jury. There is no merit in any of these contentions.
 The decedent executed the contested will on October 16, 1957; the testator, a bachelor, died on October 27, 1957, at the age of 82, survived by his sister, the respondent, Rae Moorehead. At the time of his death, John Edward Calway was the owner of real property in San Martin, in Santa Clara County. By the contested will of October 16, 1957, he left his entire estate to the appellant; Francis Crawford was named the executor. The will also stated: "I further declare that I have no children or immediate family and specifically omit any provision therefor. If anyone should attack the provisions of this will and prove himself to be an heir, I hereby bequeath to said person the sum of $1.00."
 For several days before October 16, 1957, the decedent was very ill, bleeding rectally and vomiting. He lived in his home in San Martin with the appellant, who was his housekeeper. When the appellant encountered some difficulty in obtaining a doctor on the 16th of October, she enlisted the aid of Francis Crawford, an attorney who had been handling various matters for the decedent since March 1957, and whose partner was the attorney for the Wheeler General Hospital in Gilroy. After 6 p. m. on October 16, 1957, the decedent was taken by ambulance to the Wheeler General Hospital.
 The decedent was treated in the emergency room by Dr. Lucid who had attended him and the appellant for several minor ailments on a few prior occasions. The decedent's condition was diagnosed as strangulated hernia; he was in a state of near shock, running a low-grade fever, and was dehydrated. Dr. Lucid tried to talk to him, but "it wasn't very rewarding medically." Another doctor was called in for consultation. At about 8 p. m., the decedent was taken from the emergency room and admitted to a room in the hospital. There he was given a blood transfusion, and about 10:15, dextrose, water and oxygen were administered intravenously.
 About 9:30 p. m., Crawford asked Dr. Lucid if the decedent *271 was competent to make a will; the doctor said yes, told Crawford to hurry, but was so busy making arrangements for the patient that he did not attach too much importance to the matter. Thereafter, Crawford went to the decedent's room and asked whether he had a will and whether it said what he wanted; Crawford testified that the decedent told him that he had a prior will in his safe at home and wanted him to go get it as he wanted to change his will. Crawford and the appellant left. En route, Crawford stopped by his home to ask his wife to phone his secretary, Mrs. Lovinger, and ask her to meet him at the hospital. Crawford was unable to open the safe and returned to the hospital with the appellant. Crawford asked the decedent whether he wanted to leave the will or make a new one, and the decedent indicated that he wanted to make a new one, leaving his property to the appellant.
 Mrs. Lovinger testified that she received Crawford's call about 9:45, and that it took her some time to dress and arrive at the hospital and send her husband to the office for a shorthand book. The will was dictated to her by Crawford, then typed and read to the decedent, who was only capable of making "affirmative noises." Mrs. Lovinger testified that the decedent was of sound mind, but that she depended on the appellant and Crawford for an interpretation of what the decedent was saying as at times, she could not understand him; that at no time did she hear the decedent discuss his property; that at one time he said "no will"; that the decedent's condition was such that she believed Crawford must have previously discussed the will with him "because he sure couldn't get it out of John that night." Crawford, however, testified that he had never previously discussed the subject of a will with the testator. Mrs. Lovinger further testified that during the discussion and execution of the will, the appellant was present; that Crawford and the appellant had to hold the decedent and the paper as he signed because he was lying down and had the tube in his left arm.
 The other witness to the will, Mrs. Lovinger's husband Fred, refused to give an opinion as to the decedent's mental condition as he had no knowledge of it. Fred Lovinger, however, testified that the decedent looked weak and sick, did not hear him discuss his property or relatives, and did not indicate that the document was his last will and testament. Both Crawford and the appellant testified that the decedent was as mentally alert as he had been before he entered the hospital, *272 that he was of sound mind, discussed his property and his relatives, and expressed an intent to take care of the appellant, and specifically requested the $1.00 provision. The appellant testified that she did not leave the hospital until after midnight and that the decedent's condition remained the same throughout the evening.
 Mrs. Williams and Mrs. Dugdale, the two nurses who took care of the decedent from 11:30 p. m. that night until about 7 a. m., testified that the decedent was irrational, did not know or understand what was going on, kept fighting and trying to get out of bed, so that he needed restraints and was given a quieting drug about 3 a. m.; that he told them he had lots of money hidden in books in the library. The testimony of the nurses was fully corroborated by the hospital records, one of which, dated October 19, indicated that the decedent's mental state was "slightly improved over his complete irrationality of the last 48 hours." The hospital records also indicated that the decedent remained in a condition of near shock until about 1 a. m. on October 17. Mrs. Dugdale further testified that she took care of the decedent for each of the 11 nights of his stay at the hospital and that his condition was substantially the same at all times. The appellant testified that the decedent's mental condition did not deteriorate until after the amputation of his leg on October 24.
 Dr. M. L. Lucid, the only medical witness, testified the decedent was suffering from arteriosclerosis when he first treated him in July of 1957. The doctor testified that this condition had affected the decedent's brain; other witnesses testified that outward manifestations of this damage, such as hallucinations with respect to the television set, had been apparent for some time prior thereto. There was also evidence that the decedent's memory was rapidly deteriorating in 1956 and that during the last year of his life, he had considerable difficulty carrying on a rational, coherent conversation; and that for many years prior, the decedent was unable to read without a magnifying glass but never owned a pair of glasses, and was also unable to write except for signing his name on checks and other documents. Two witnesses also testified that on two occasions when they had visited the decedent, the appellant had made unsolicited statements that "John is perfectly competent." Several other witnesses testified that although old and cantankerous, the decedent was of sound mind in the months before his death, particularly during the *273 transactions relating to the sale of one piece of property and the acquisition of another in June 1957.
 Appellant here first argues that the above evidence is not sufficient to sustain the finding of incompetency at the time of the execution of the will. It is not within our province here to decide whether John Calway was competent to execute the will dated October 16, 1957. That question is one of fact for the trial court. [1] As so aptly said in Estate of Frank, 102 Cal.App.2d 126 [226 P.2d 767], at page 128:
 "The function of an appellate court is no different on an appeal from a judgment denying probate of a will because of mental incompetency than in any other case. 'All conflicts must be resolved in favor of the respondent and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial judge or jury ...' ..."
 Appellant, relying particularly on Estate of Bullock, 140 Cal.App.2d 944, 948 [295 P.2d 954, 297 P.2d 633], argues that the testimony of Dr. Lucid and the nurses is no more than an indication that the decedent was of unsound mind in the medical sense, and that the respondents here have not met their heavy burden of proof to overcome the presumption of the testator's competency. [2] However, as indicated above, there was conflicting evidence as to whether the decedent was capable of recalling the nature and extent of his estate, the natural objects of his bounty, and of understanding the nature of the act he was doing. Necessarily, therefore, appellant's contentions which are essentially a reargument of the weight and sufficiency of the evidence are without merit. While it is true that much of the evidence was in conflict, to review those conflicts is not the province of this court.
 Equally without merit is the appellant's further contention that the testimony of most of respondents' witnesses was too remote in point of time. [3] As said in Estate of Kirk, 161 Cal.App.2d 145 at page 150 [326 P.2d 151]:
 " 'Proof of the sanity of the testator and of the facts upon which his state of mind depends are not necessarily confined to the exact time of the execution of the will. Evidence of the testator's mental status, together with his appearance, conduct, acts, habits and conversation, both before and after the execution of the will, are admissible so long as they have a *274 reasonable tendency to indicate his mental condition at the time of the execution of the will. Its weight was for the jury to determine. [Citations.] This is particularly true when the characteristics of the malady indicate a permanent and progressing mental disease.' (Estate of Hartley, 137 Cal.App. 630, 633 [31 P.2d 240].) ..."
 In Estate of Fosselman, 48 Cal.2d 179, 185 [308 P.2d 336], it is held that "Testamentary incompetency on a given day, however, may be proved by evidence of incompetency at times prior to and after the day in question."
 A review of the entire record herein leads us to the conclusion that we cannot hold as a matter of law that there is no substantial evidence to support the finding of the jury that the testator was not able to make a will on October 16, 1957, because of extreme mental and physical weakness.
 [4a] The next argument on appeal is that the evidence does not support the jury's finding of undue influence. [5] The recognized indicia of undue influence in this state are: (1) The provisions of the will are unnatural; (2) the dispositions are at variance with the express intentions of the testator; (3) the relations between the decedent and the chief beneficiary afforded the latter an opportunity to control the testamentary act; (4) the mental and physical condition of the decedent permitted a subversion of his will; and (5) the chief beneficiary was active in procuring the execution of the will (Estate of Lingenfelter, 38 Cal.2d 571 [241 P.2d 990]).
 [4b] The record indicates that about the turn of the century, the decedent asked the respondent Moorehead and her husband to come to California with him. They lived together in Oakland until World War I, when the decedent returned to New York. In 1920, the decedent returned to Oakland, and lived alone in an apartment, but often visited his sister and her family. After the decedent moved to Los Altos in 1930, he often saw his sister and her family; when the Moorehead's son was taken ill, he lived with the decedent in Los Altos for three years. The families continued to visit each other on holidays and other occasions. Mrs. Moorehead took care of her brother whenever he became ill.
 From 1930 until 1950, the decedent lived with Mr. and Mrs. Loveroff, who were his partners in a chicken ranch in Los Altos. After their daughter, the respondent Eleanor June Loveroff Grediagin, was born in 1936, the decedent helped to take care of her. He brought her many gifts, some *275 of them of a very substantial nature, and always took her side. In 1950 when Eleanor was about 15, the Loveroffs and the decedent had a falling out which resulted in a lawsuit over the Los Altos property. The decedent prevailed and the Loveroffs moved out in December 1950. Although Mr. and Mrs. Loveroff did not see the decedent for a few years thereafter, Eleanor continued to visit the decedent and ride the horse he had given her for her 13th birthday. The decedent continued to send presents to Eleanor until her marriage.
 In 1954, the decedent moved from Los Altos to San Martin. Several times a month, at the request of decedent, Mrs. Loveroff came to see him and write out his checks for him. Eleanor graduated from high school that same year, went away to college in Arcata, and lived there after her marriage in 1956. Although she did not see the decedent very much thereafter, he continued to show the same affection for Eleanor, called her by his pet name "Baby Doll"; spoke very highly of her to others and had many pictures of her in the house. When Eleanor and her baby and Mrs. Loveroff last visited the decedent in 1957, he gave them an album of Eleanor's baby pictures. In August 1957, the decedent accompanied by the appellant and her boy friend came to see the Loveroffs at their home in Redwood City and tried to borrow some money. Mrs. Loveroff asked the appellant to notify her if the decedent became ill.
 Shortly after the decedent moved to San Martin, his sister and her husband went to visit him but did not see him because he had been drinking. Thereafter, partly because of her own ill health, partly because she had heard of the appellant's presence, Mrs. Moorehead did not see the decedent again; she did, however, leave word with Mrs. Turgeon, whose office was nearby, indicating she wanted to be called if the decedent became ill or otherwise needed her help. Shortly before his death, the decedent asked about his sister and stated that he wished she would visit him. However, she was confined to her bed; her husband and son went to the Wheeler Hospital to visit the decedent during his last illness.
 The appellant testified that she first met the decedent in early 1956 when a real estate man took her to see the decedent's property on Llagas Avenue in San Martin, which was then for sale. Her former husband, Mr. Vargas, testified that he first met the decedent in the course of his work as a salesman and invited him to visit in 1956. The decedent *276 visited Vargas and the appellant at their home; often, Vargas would leave the appellant at the decedent's home to clean and run errands for him, etc. The decedent did not drive a car and lived a considerable distance from a store.
 In March 1957, at the decedent's request, the appellant moved into his home in Llagas Avenue to take care of him. At that time, there was no understanding that the appellant would be compensated for her services. However, she testified that several months later, the decedent paid her $25 for two months; another $35 a month later; and $50 per month thereafter until the decedent was hospitalized. No checks evidencing such payments were found. The appellant first met Crawford in May 1957, when the decedent took her to Crawford's office in Gilroy; the decedent paid Crawford for his services in restoring the appellant's maiden name in her divorce from Vargas. During the period of time when the appellant took care of the decedent, her sister came in to write checks for the decedent and do some bookkeeping. There was some evidence that the decedent did not like her and about a month before his death had expressed a desire to get rid of her because she stayed out late.
 Other evidence adduced at the trial indicated that in 1920, the decedent executed a will in favor of his sister; in 1948, the decedent executed another will, bequeathing $10,000 in trust for Eleanor Loveroff and devising the balance of his estate to his sister. In 1955, the decedent executed a testamentary document bequeathing $2,500 to his sister and the residue of his estate to Eleanor Loveroff. The 1955 document, however, was not a valid will because of certain defects in its execution. Eleanor Loveroff was also the beneficiary of the decedent's life insurance policy and received the proceeds of $1,003.62 after his death. Thus, there was ample evidence to indicate that the provisions of the will of October 16, 1957, leaving the entire estate of the decedent to the appellant are unnatural and at variance with the express intentions of the testator during the 80 or so years of his life before he met the appellant. In view of what we have said above, there is also no question that the decedent's mental and physical condition were such as to permit a subversion of his will.
 The appellant's opportunity to control the testamentary act of the decedent may be established by a variety of circumstances, such as the dependency of the testator upon the beneficiary for care and attention (Estate of Washington, 116 Cal.App.2d 139, 145 [253 P.2d 60]). Here, in addition *277 to ample evidence of such dependency, there was evidence that the appellant attempted to keep Mr. Belser, an old friend, from seeing the decedent; and that although specifically requested to do so, the appellant did not notify Mr. Belser or Mrs. Loveroff of the decedent's last illness.
 As to the appellant's active participation in the procurement and execution of the will, Mrs. Lovinger testified that during the preparation of the will, the appellant was sitting by the bed holding the testator's hand; and that as she could not understand what the testator was trying to say, either Crawford or the appellant would interpret for her. On one such occasion, Mrs. Lovinger testified the testator said "no will"; the appellant interpreted this to mean that he did not want to name his sister in the will. On another occasion, the testator indicated that he wanted to name "Oakland" as executor; the appellant interpreted this to mean Crawford. Mrs. Loveroff testified that the decedent often used the term "Oakland" to identify his sister and her family.
 Mrs. Lovinger also testified that the appellant was present both during the discussions of the will and at the time of execution. Crawford could not remember whether or not the appellant was present in the room at either time. The appellant testified that she left the room before the discussions about the will, and unequivocally asserted that she was not present when the will was executed.
 From the above, the jury could infer that the appellant actively participated in the preparation and execution of the will of October 16, 1957. There is, therefore, no question that the evidence amply establishes all the indicia of undue influence.
 We will now turn briefly to the arguments concerning the instructions to the jury and the admission of certain evidence.
 Appellant argues that the court erred in its instructions to the jury and in refusing certain proffered instructions. Upon viewing the instructions as a whole, we conclude that there is no merit in these contentions (Scarano v. Schnoor, 158 Cal.App.2d 612 [323 P.2d 178, 68 A.L.R.2d 416]).
 [6] The final argument is that the trial court erred in admitting certain evidence. The trial court permitted William Moorehead, the husband of the respondent, Rae Moorehead, to testify that on October 16, 1957, shortly after the execution of the contested will, he received a telephone call from Crawford who stated that the decedent was in the hospital and was in such a condition that he should be committed *278 to Agnew. Appellant argues that this evidence was erroneously admitted. We cannot agree. It is clear that the evidence was admitted for the limited purpose of impeaching the witness Crawford who had previously testified that the decedent was of sound mind at the time of the execution of the will and the jury was properly instructed about the limitation.
 [7] Appellant also argues that the court erred in failing to strike Mr. Moorehead's hearsay testimony that on a visit to Wheeler Hospital, he said to a nurse "Don't attempt to arouse him [the decedent]. The man evidently is in a coma." However, this testimony was merely an opinion of the witness who also testified as to the facts on which he based his opinion; as the witness Moorehead was in court and subject to cross- examination, there was no hearsay problem (People v. Bob, 29 Cal.2d 321, 325 [175 P.2d 12]).
 No prejudicial error appearing in the record before us, the judgment must be and is hereby affirmed.
 Shoemaker, J., and Agee, J., concurred.