225 Cal.App.2d 156 (1964)
ESTATE OF SYLVIA A. MORGAN, Deceased. THE DOMESTIC AND FOREIGN MISSIONARY SOCIETY OF THE PROTESTANT EPISCOPAL CHURCH IN THE UNITED STATES OF AMERICA, Plaintiff and Respondent,
v.
ALICE B. PETERSEN et al., Defendants and Appellants.
Civ. No. 20575. 
California Court of Appeals. First Dist., Div. Three. 
Feb. 27, 1964.
 C. Ray Robinson, John Lockley, William B. Boone, Howard R. Benson and James C. Walsh, Jr., for Defendants and Appellants.
 John D. Gallaher, John Wynne Herron, Herron & Winn and Cyril Viadro for Plaintiff and Respondent.
 DEVINE, J.
 This is an appeal from a judgment denying probate of a purported will, which had been entered upon verdicts that the decedent did not have testamentary capacity and that she was acting under undue influence. Proponents appeal also from an order denying motion for judgment notwithstanding verdicts.
 On the issues of testamentary capacity, the appeal is based entirely on insufficiency of the evidence to support the verdict.
 A. Facts
 1. General Facts
 Syvia A. Morgan died December 30, 1960. Her age was not known with certainty, but was given for the death certificate by Alice B. Petersen, her companion, an appellant, as 93 years. She had been widowed twice. She had no direct descendants. Her only relatives were her two grandnephews, Phillip Wemer and Paul E. Wemer, who are among the appellants. She left an estate of about $600,000, of which more *159 than $300,000 was in bank deposits. The will under attack was executed November 30, 1960.
 2. Medical and Quasi-Medical Evidence
 Donald D. Lum, M. D., was Mrs. Morgan's physician from February 1960 until her death. He saw her on about ten or twelve occasions, spread through the months, which he counted as professional visits and for which he charged; but he saw her other times on his way through Marina Sanitarium, where she was a patient. His last visit before November 30, 1960, the date of the will, was on November 4, 1960. His opinion was that in the last few months of her life, Mrs. Morgan was senile and confused and of unsound mind; that she had marked arteriosclerosis; that this was throughout her body, including her brain; that she suffered from the progressive effect of the disease; that in the early part of the year she talked with him and cooperated with him but, later in the year, most of the time she didn't recognize him and the nurse would have to introduce him.
 William R. Hirst, M. D., an ophthalmologist, examined Mrs. Morgan's eyes on November 1, 1960. Trouble with the lids and tear duct was the problem, but the doctor also examined the retina and found a rather advanced arteriosclerotic change in the retina vessels and hardening of the lens.
 Attendants at the sanitarium recounted incidents when testatrix talked of snakes and worms being in her bed, of pigs being on the floor, of men chasing pigs at night, and of elephants being on the ceiling. It was also shown that one morning testatrix told the attendant to wake up the "boy" first (there was a lady in the next bed); that another day testatrix wanted to get dressed so that she could go down and cook breakfast for her father. In the opinion of Mrs. Law, a registered nurse, testatrix, for the last five months of her life, was senile, which the witness defined as disoriented and suffering from hallucinations, and generally confused, with very, very short lucid periods. Mrs. Wolf, a vocational nurse, with some experience working with the senile, was of the opinion that testatrix in the last few months of her life was confused, disoriented and not of sound mind. Mrs. Paige and Mrs. Stark, both nurses' aides, were of the same opinion. Finally, according to Mrs. Barnes and Mrs. Fitzpatrick, also nurses' aides, testatrix was very confused. These witnesses were not asked questions about decedent's ability to know her estate, the objects of her bounty, and the nature of the testamentary act. *160
 The nurses' record contained but a few notations of testatrix' hallucinations and confusion. It was explained at the trial that once a patient established a pattern of behavior, incidents within that pattern were not recorded. The patient's daily records at the sanitarium are sketchy, and they do not necessarily have the force which appellants contend for them. They do show that the patient had a good night on November 29, the night before the will was executed; but they show the same on October 30, the night before Mr. Bowser's last visit (she was obviously incompetent when he came, as appears below), and on the night before she died, when she was suffering from hypostatic pneumonia.
 3. Testimony of Mr. Bowser
 The testimony of William D. Bowser, a lawyer, is of importance because he is the only lawyer who gave a full account at the trial of conversations with Mrs. Morgan, and his testimony shows that at a time not far removed (one month) before the execution of the challenged will, Mrs. Morgan, while consulting Mr. Bowser about a new will, was hopelessly confused about the main object of bounty, the residuary legatee.
 Mr. Boswer drew a will for testatrix on September 5, 1957. He had been sent for by Mrs. Morgan, who in turn had told Mrs. Petersen of him. Mrs. Petersen's acquaintance with Bowser was slight. Mr. Bowser testified fully as to his conversations with Mrs. Morgan, and he made elaborate notes. He drew a relatively minor codicil for her on August 7, 1959. He drew a rather substantially altered will which was executed April 18, 1960. On this occasion, testatrix wished to leave Mr. Bowser, with whom she had no acquaintance except on about three professional occasions, $10,000; but he declined. The residuary legatee in all of these wills, and in two wills previously drawn by Attorney Charles A. Beardsley, was respondent, The Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States of America (hereinafter called the Episcopal Missionary Society). Testatrix declared, in each of the wills, in respect of the residuary bequest, that it was her "wish that this be used in foreign missionary work, preferably in Red China, India and Africa, for the benefit of people who have not had the advantage of hearing and learning the teachings of Jesus Christ."
 On October 27, 1960, at testatrix' request, Mrs. Petersen telephoned Bowser and informed him that testatrix did not want to leave her property to Red China and that testatrix *161 also wanted to change other parts of her will. Bowser pointed out to Mrs. Petersen that the will did not give anything to Red China, and he further advised Mrs. Petersen that if testatrix wanted the will changed, she should have a nurse contact him, that he was not going to change a will at the request of a beneficiary. Two days later, Mr. Taylor, an old friend of testatrix, contacted Bowser and told him that testatrix wanted to change her will and leave nothing to Red China. Mr. Taylor also informed Bowser that if Bowser was unwilling to call upon testatrix, he would arrange for someone else to attend to the matter. Bowser thereupon agreed to see testatrix the following afternoon.
 Accordingly, Bowser visited testatrix at the sanitarium on October 31, 1960. Mrs. Petersen was leaving as Bowser arrived. Bowser explained to testatrix that she was giving the residue of her estate to respondent, and not to Red China, and that respondent would be under no legal obligation to use the money in Red China. As Bowser went back over the first part of the will, testatrix appeared to have a fair grasp of what it meant. But when Bowser reached the residuary clause, testatrix was insistent that it was not correct. In response to Bowser's question as to whom she wished to leave the residue of her estate, testatrix replied that she wanted to leave it to her sister, Christina Pritcher. The sister had been dead since 1949. When Bowser pointed out that the sister was deceased, testatrix insisted that she was alive and working in Santa Rosa. Testatrix' understanding of the situation then deteriorated rapidly, and Bowser came to the conclusion that she was not competent to make a will at that time. According to Bowser, testatrix appeared to be sensible as long as she was asked leading questions. Mr. Bowser left and never saw Mrs. Morgan again.
 4. Testimony of the Hartungs and Mr. Wulff
 The testimony of Mrs. Hartung and her daughter, acquaintances, was that testatrix couldn't understand anything when they last visited her on December 4, 1960. Mr. Wulff, who would receive the same legacy, $25,000, whether the will of November 30 or that of April 18 were the prevailing one, testified that testatrix was of unsound mind on Thanksgiving Day, 1960 and did not recognize him, although he had seen her frequently.
 5. The Wills
 Testatrix made five wills and one codicil in the period commencing August 15, 1955, and ending November 30, 1960. *162 A diagram showing the essentials of these follows. As each bequest that is new appears, it is underlined; and as each removal of a bequest appears, it is in a box. The contestant of
 Tabular Material Omitted
 *163 the November 1960 will is the Episcopal Missionary Society, the residuary legatee in the April 1960 will. The showing in the diagram of the provisions of earlier wills is for the purpose of displaying the continuity of certain bequests over a period of years (including the residuary one to Episcopal Missionary Society).
 6. The Contested Will of November 30, 1960
 (a) The attorneys. Mrs. Petersen testified that the selection of attorneys came about in this way: Testatrix instructed Mrs. Petersen not to bring Bowser back, but to obtain the services of either John F. Neylan or Theodore Roche. When Mrs. Petersen informed testatrix that these two men were either dead or retired, testatrix asked Mrs. Petersen to get the attorney who handled the Henry Miller estate. When she was a young woman, Mrs. Morgan knew Henry Miller. Accordingly, Mrs. Petersen contacted C. Ray Robinson's office, and met with Mr. Robinson and Mr. Lockley at the Clift Hotel on November 29, 1960. After this meeting, Mrs. Petersen, Lockley, and Miss Christensen, Lockley's secretary, drove over to the Marina Sanitarium. After Mrs. Petersen made the introductions, she departed; and with Miss Christensen taking notes, testatrix gave Lockley instructions for a new will.
 Mr. Lockley did not testify, nor did Miss Christensen, about the instructions given by testatrix at the November 29 meeting. Both testified about the execution of the will.
 (b) Execution of the will. On November 30, 1960, Lockley returned with Miss Christensen and Miss Welsh, a research assistant in his office. Mr. Clark, who had been contacted by Mrs. Petersen, and Mrs. Petersen arrived. Mrs. Petersen had a moment alone with testatrix before testatrix met the others. According to Miss Christensen, testatrix did not seem to recognize anyone except Mrs. Petersen; Lockley, however, felt that she recognized him; and Miss Welsh stated that testatrix appeared to recognize persons in the room. When Lockley indicated that Mrs. Petersen should leave, testatrix insisted that she stay, and Mrs. Petersen therefore remained for the reading and execution of the will. Lockley read the will, stopping at every paragraph to ask testatrix if she understood and if that was what she wanted; testatrix would answer "yes" or nod affirmatively. According to Mr. Clark, once or twice during the reading of the will and after the reading of the residuary clause, Mrs. Petersen said to testatrix, "Auntie Sylvia, that is what you want, isn't it?" On *164 the other hand, Miss Christensen testified that no one but testatrix and Lockley spoke during the reading of the will. Mrs. Petersen testified that she did speak those words, but only after testatrix had executed the will and only with reference to the directions on burial in the will. In the conversation after the execution of the will, testatrix stated that she had known Mrs. Petersen more than 40 years, and corrected someone who had referred to Sonoma County as "Santa Rosa County."
 The four witnesses to the will, Mr. Lockley, the attorney, Mr. Clark, assistant city manager of Alameda, Miss Christensen, who had been a nurse and was Mr. Lockley's secretary, and Miss Welsh, also an employee of Mr. Robinson's firm, testified that the testatrix was oriented, lucid and knew what she was doing. Mr. Clark and Miss Welsh had not met her previously.
 (c) Changes made by the challenged will. It will be observed that the devises and bequests in the will of April 18, 1960, which no one attacks in this contest, are identical with those in the will of November 30, 1960, so far as they relate to Wulff, Monroe, the Wemers, Agnew and French, and Morgan, so that these persons do not stand to gain by one will over the other. The changes made in the November will are these: (1) The Crocker- Anglo National Bank is removed as executor, leaving Alice B. Petersen as sole executrix. (2) The $50,000 bequest to Mrs. Petersen is expressly given preference over all others, so that she is to be paid in full in the event the estate is insufficient to pay the other gifts. (3) The Episcopal Missionary Society is removed from the will completely. (4) Little Sisters of the Poor, a charitable corporation, is made legatee of one half of the residue, this legatee being new to the will. (5) Mrs. Hartung is eliminated as a legatee. (6) Mrs. Petersen is given the other half of the residue. She had not participated in the residue in earlier wills.
 The drastic changes described above suggest that an explanation would have been made to the jury, in view of the mental condition of testatrix as described by the doctors and other witnesses. The explanations offered are to be found almost exclusively in the testimony of Mrs. Petersen, because, as stated above, Mr. Lockley and Miss Christensen did not testify to the two- hour conversation they had with Mrs. Morgan on November 29. Mrs. Petersen's testimony gives the explanation in recounting Mrs. Morgan's statements to her, as follows: *165
 (1) As to removal of Crocker-Anglo Bank as executor. (This, of course, is simply by way of adjudging competency and influence generally, because the bank is not a party to the cause.) Mrs. Petersen testified that Mrs. Morgan was very displeased with having the Crocker-Anglo Bank named as executor, because an employee of the bank, who had been handling her affairs, had been discharged from the bank for embezzlement. Some of the witnesses to the will, too, testified that Mrs. Morgan was vehement about the matter of eliminating the bank. The discharge of the employee, however, had taken place in 1957, and since that time Mrs. Morgan had named the bank as executor in the will of April 18, 1960. Also, she kept deposits of about $90,000 in that bank up to the date of her death.
 (2) No testimony was offered by any witness about testatrix' reason for the provision that "The gift to Mrs. Alice Petersen is to receive preference over all other gifts hereinafter made, and in the event my estate is insufficient to pay all of said gifts, I direct that payment be made to Mrs. Alice Petersen in full." This is followed by the words, "In the event that there remain funds or assets of my estate after the payment of the above gift to Mrs. Alice Petersen, I make the following gifts. ..." The declaration about preference was not in any prior will. The estate consisted, at the time, of about $600,000; there were bank deposits of over $300,000, including $190,000 in a single savings account.
 (3) The reason testified to by Mrs. Petersen for elimination of Episcopal Missionary Society is: Mrs. Morgan said "she didn't want to leave any money to Red China, she didn't care for anything Communistic or Red, that she didn't know how she ever got mixed up in that." Mrs. Petersen testified she told Bowser that Mrs. Morgan did not want to leave anything to "Red Chine or to the Episcopals." Mr. Bowser testified that he had told Mrs. Petersen that the last will he had drawn for testatrix did not leave anything to Red China, but Mrs. Petersen testified she did not remember this conversation. Obviously, no will left anything to Red China.
 (4) Two reasons were offered by appellants why Mrs. Morgan may have desired to favor the Little Sisters of the Poor. The first was testimony of Mrs. Petersen that Mrs. Morgan said she had seen what happened to old people, "old age was hell," and she wanted to leave her money to the sisters to help people in their old age. Mrs. Petersen testified *166 that this conversation took place before Mr. Bowser went to see Mrs. Morgan the last time, but apparently Mrs. Morgan did not say anything about this to Mr. Bowser because, as related above, she told Mr. Bowser she wished the residue to go to her sister, who had long since died. Mr. Lockley testified that "when we came to the part where it divided the residue of the estate between Mrs. Petersen and the Little Sisters of the Poor, I said, 'Now, is that what you want? You are sure this is it?' And she said, 'Yes, I want the poor old people to get it.' "
 The second reason offered for the change in eleemosynary beneficiaries consisted of several rather inconclusive items respecting testatrix' religious ties. Apparently, Mrs. Morgan was a Catholic in her younger years, and had been godmother to a nephew whom she had reared in that faith. In her late years, she had at times religious medals about her bed, and had requested Mrs. Petersen to bring them to the sanitarium, which Mrs. Petersen neglected to do. At the conclusion of the execution of the will of November 30, 1960, Mrs. Petersen told Mr. Lockley that Mrs. Morgan wished to see a priest. Mrs. Morgan said she wanted one of German extraction. She said she wanted to go back to the church she was born in. On the other hand, testatrix had been married before a Lutheran minister; she told Mr. Bowser that she used to go to the Episcopal Church; and when the priest came to see her, she said she did not wish to see him. She did see him for about five minutes, however, when she was told by a nurse that Mrs. Petersen wished her to do so. She had made rather trifling gifts of clothing and furnishings to the Little Sisters of the Poor.
 (5) No one testified about any reason given by testatrix for the very large gift of one half of the residue to Mrs. Petersen.
 (6) Mrs. Petersen testified that Mrs. Hartung was eliminated as a legatee because Mrs. Morgan said Mrs. Hartung had not visited her after she knew she had been made a legatee.
 7. Mrs. Petersen's Testimony
 No doubt the testimony of Mrs. Petersen, the confidante of the testatrix, who would benefit so largely from the November will, had an important bearing on the verdicts of the jury. Her testimony clashes directly or indirectly with that of other witnesses: (a) In contrast with the testimony that *167 Mrs. Morgan's mental condition was deteriorating as the months went on, Mrs. Petersen testified that testatrix became mentally sharper in the last three months. (b) She testified that there was but one occasion in her frequent visits with the testatrix when the latter showed confusion, and this was the mild delusion that she had been in the basement instead of on the ground floor. (c) She stated that Mrs. Morgan had said that Wulff and Bowser were "conniving schemers," at sometime before the execution of the will of April 18. However, Mrs. Morgan made Mr. Wulff a legatee in all of her wills, and according to Mr. Bowser, desired to leave Bowser $10,000 in the April will. (d) There is a conflict between Mrs. Petersen's testimony and that of Mr. Clark as to the putting of the question referred to above, asking if this was what testatrix wanted. (e) Mrs. Law testified that Mrs. Petersen gave Mrs. Morgan's religion, on entry to the sanitarium, as "Protestant" and it was so entered on the record; but Mrs. Petersen testified that she gave the religion as "Christian."
 All in all, the testimony of Mrs. Petersen portrays testatrix as a brilliant woman who was extremely sharp, although physically frail; while that of several other witnesses, as given above, describes a woman of deteriorating mentality.
 B. General Legal Principles
 [1] The general legal principles are:
 1. The province of a reviewing court in a will contest is the same as in any other civil case: its power begins and ends with a determination whether there was any substantial evidence, contradicted or uncontradicted, which will support the conclusion of the jury (Estate of Lauth, 180 Cal.App.2d 313, 317 [4 Cal.Rptr. 764]); and all legitimate and reasonable inferences are to be indulged in to uphold the verdict, if possible (Estate of Calway, 196 Cal.App.2d 268, 273 [16 Cal.Rptr. 462]; Estate of Bourquin, 161 Cal.App.2d 289, 297 [326 P.2d 604]; Estate of Frank, 102 Cal.App.2d 126, 128 [226 P.2d 767]).
 [2] 2. This fundamental rule applies where a jury has determined that one who purported to make a will did not have testamentary capacity because of unsoundness of mind. (Estate of Fosselman, 48 Cal.2d 179 [308 P.2d 336]; Estate of Watson, 195 Cal.App.2d 740, 742 [16 Cal.Rptr. 125]; Estate of Calway, supra, p. 273.)
 [3] 3. Testamentary competency is to be determined as of *168 the time of execution of the will. (Estate of Lingenfelter, 38 Cal.2d 571, 580 [241 P.2d 990].)
 [4] 4. Testamentary incompetency on a given day, however, may be proved by incompetency at times prior to and after the day in question. (Estate of Fosselman, supra, at p. 185; Estate of Calway, supra, at p. 273.)
 5. This is particularly true when the characteristics of the testator's malady indicate a permanent and progressing mental disease. (Estate of Calway, supra, at pp. 273-274; Estate of Kirk, 161 Cal.App.2d 145, 150 [326 P.2d 151].)
 C. Application of Legal Principles to Facts
 1. The particular hallucinations which afflicted the testatrix are not of first importance in themselves. [5] A hallucination is not of itself destructive of testamentary capacity unless it operates directly on the testamentary act. (Estate of Lingenfelter, 38 Cal.2d 571, 581 [241 P.2d 990].) The hallucinations are to be regarded, rather, in connection with the respondent's claim that a permanent and progressing mental disorder of general nature existed.
 2. The medical testimony is that testatrix had marked arteriosclerosis and during the last few months of her life was senile, confused and of unsound mind.
 [6] 3. Testatrix' physician was not asked specifically about her ability to understand the nature of the act she was doing, to recall the nature and situation of her property, and to remember and understand her relation to those having claims to her bounty and whose interests would be affected by her will. This ability is the test of testamentary capacity. (Estate of Sexton, 199 Cal. 759, 764 [251 P. 778].) [7] However, it is not necessary that the whole proof of contestant's case come from any single witness.
 4. The will of November 30, 1960, contains one item which in itself casts doubt on the element of testatrix' understanding of the nature of her property. This is the item in which so much emphasis is placed on the preferential position of the bequest of $50,000 to Mrs. Petersen, with the instruction that it is to be paid in full and that other gifts shall take effect only if sufficient funds remain above the $50,000. When the age of testatrix, the size of her estate, and the large amount of bank deposits were considered by the jurors, they may have concluded that she did not know the nature of her estate; in particular, the triers of fact may have concluded that she did not appreciate the large size of the residue.
 5. Miss Christensen, one of the witnesses to the will, testified *169 that testatrix did not seem to recognize anyone except Mrs. Petersen, although she had had a two-hour conference with Mr. Lockley the day before. There was argument that this may have resulted from her poor eyesight, but the jury may have concluded that more than defective vision was involved.
 6. The visit of Mr. Bowser with Mrs. Morgan on October 31 no doubt weighed heavily with the jury. It demonstrated that Mrs. Morgan had no knowledge, at that time, of the proper object of her bounty as to the large residuum of her estate, which she wished left to a sister she then thought to be living, though she had known her to be dead. This she thought at a time when, it would appear, she also thought she was capable of making a will, if, indeed, she was capable of making this decision; and also, it was at a time when Mrs. Petersen, too, it seems, would have thought Mrs. Morgan capable of testamentary action. In Estate of Fritschi, 60 Cal.2d 367 [33 Cal.Rptr. 264, 384 P.2d 656] which appellants cite, no such instances were shown. The real impact of contestants' arguments rested on the assertion of drug-induced incompetence on the morning of execution of the will (p. 371).
 7. At the time of drafting the will of April 4, 1960, Mrs. Morgan wished to leave Mr. Bowser $10,000, although she had but slight acquaintance with him and although she had, according to Mrs. Petersen's testimony, called him a "conniving schemer."
 [8] 8. The fact that an attorney declined to make a will, as Mr. Bowser did, is entitled to serious consideration as proof of testatrix' incompetency. (Estate of Halbert, 80 Cal.App.2d 666, 671 [182 P.2d 266].)
 [9] 9. Of course, the testimony of the attorney who drew the contested will is entitled to much weight, particularly when he is a subscribing witness. (Estate of Hansen, 38 Cal.App.2d 99, 115 [100 P.2d 776].) This does not mean, however, that his testimony is conclusive. (Estate of Miller, 16 Cal.App.2d 154, 164 [60 P.2d 498]; Estate of Nelson, 134 Cal.App. 561, 565 [25 P.2d 871]; Estate of Hansen, supra, at p. 115.) To be given consideration is the fact that the attorney was a comparative stranger to the testatrix. (Estate of Bliss, 199 Cal.App.2d 630, 639 [18 Cal.Rptr. 821].) The testimony of the attorney and of the witnesses to the execution of the will merely create a conflict with the evidence of incapacity. (Estate of Frank, 102 Cal.App.2d 126, 130 [226 P.2d 767]; Estate of Pessagno, 58 Cal.App.2d 390, 402 [136 P.2d 644].) *170
 [10] 10. A very considerable omission of available testimony appears. Mr. Lockley and his secretary spent two hours with Mrs. Morgan on the day before the will was executed. This was the only time her new attorney had seen her. What directions she gave him, and in what manner; what reference she made, if any, to her earlier wills; what reasons, if any, she gave for changes; the whole conversation relating to the proposed will--all of these could have been brought out, not only to give the jury information upon which to decide, but also to explain the attorney's and the secretary's own conclusion that testatrix was mentally competent. No testimony was offered upon the substance of the conference. At the trial, counsel for appellants expressed the proposition that such testimony might be privileged, as, indeed, it would have been during testatrix' lifetime. The testimony was available on contest of the will, privilege being deemed waived. (Estate of Nelson, 132 Cal. 182, 188 [64 P. 294]; Estate of Wax, 106 Cal. 343, 349 [39 P. 624]; Estate of Mullin, 110 Cal. 252, 256 [42 P. 645]; 8 Wigmore on Evidence (McNaughton rev.) 2314, p. 614; 3 Jones on Evidence (5th ed.) 835, p. 1568. [fn. 1]) Indeed, in some of the cases cited by appellants, the instructions given by the testator to his attorney were an element of proof of competency. (Estate of Lingenfelter, 38 Cal.2d 571, 582 [241 P.2d 990]; Estate of Ross, 204 Cal.App.2d 82, 92 [22 Cal.Rptr. 135]; Estate of Russell, 80 Cal.App.2d 711, 720 [182 P.2d 318].) This testimony, it seems to us, would have had greater weight, one way or the other, than that which related to the answering of categorical questions, the procedure which characterized a good deal of the ceremony of execution of the will. Mr. Bowser testified that on October 31 (when, if Mrs. Morgan had her way, she would have left the bulk of her estate to a deceased sister) Mrs. Morgan could answer leading questions.
 [11] 11. As appellants contend, a testator who is mentally competent may make whatever disposition, or changes in the disposition, of his property he pleases. But an unexplained, or poorly explained, change from a previous testament, executed while decedent had recognized mental capacity, is an evidentiary fact which bears on the subject of unsoundness of mind, when considered with other evidence. (Estate of Mullen, 8 Cal.App.2d 684, 686 [47 P.2d 746].) *171 The facts on this subject are given above. The jury may have found the attempted explanation deficient in the light of the testimony on incapacity produced by contestant.
 [12] 12. Mrs. Petersen was the only witness appellants produced on testatrix' capacity who had known her intimately. Her testimony conflicted with that of other witnesses. It was for the jury, and it is not for us, to assess the testimony, in a will contest as in any other case. (Estate of Teel, 25 Cal.2d 520, 526 [154 P.2d 384].)
 We think it is unnecessary for us to discuss the ground of undue influence.
 [13] Appeal from order denying appellants' motion for judgment notwithstanding the verdict, dismissed, because the order is not appealable. (Prob. Code, 1240; Estate of Webster, 43 Cal.App.2d 6, 18 [110 P.2d 81, 111 P.2d 355].)
 Judgment is affirmed on the ground of mental incompetency.
 Draper, P. J., and Salsman, J., concurred.
NOTES
[fn. 1] 1. Notes taken by the secretary were ordered by the trial judge to be produced, over objection that they were privileged. Positive testimony, however, on appellants' behalf, of the meeting was not offered.