[Civ. No. 29970.   Second Dist., Div. Two.   June 23, 1966.]

Estate of JOHN NIGRO, Deceased. FRANK NIGRO, Plaintiff and Respondent, v. ESTERINA FATA et al., Defendants and Appellants.

F. M. Andreani and A. W. Brunton for Defendants and Appellants.

Thomas C. Lynch, Attorney General, and Carl Boronkay, Deputy Attorney General, as Amici Curiae on behalf of Defendants and Appellants.

Virgil R. Wells for Plaintiff and Respondent.

McCOY, J. pro tem.*—This is an appeal from a judgment on the verdict of a jury in a contest of a will before probate, and from the orders of the trial court denying appellants' motions for a judgment notwithstanding the verdict and for a new trial.

On July 22, 1962, John Nigro, a shoemaker by trade, signed a typewritten document, here referred to as the Will, by which he bequeathed "three separate pieces of property" in Italy to his niece, Esterina Fata, and bequeathed "the balance of my Estate . . . to the betterment of the town in Italy where I was born, Grimaldi, Italy," with directions that the "Funds are to be wisely spent to build and equip a hospital adequate to fill the needs of the residents of Grimaldi, Italy." He also bequeathed "to my son, his wife and two children . . . the sum of one dollar ($1.00) each." The Will ends with the provision that "should any blood relations, or my two ex-wives contest this document, I hereby bequeath them the sum of one dollar ($1.00) each."

John Nigro died in Los Angeles County March 7, 1963, at the age of 62 years.

A petition for the probate of the Will was filed October 24, 1963, by the named beneficiaries. Objections to the probate of the Will were filed by Frank Nigro, the only child of decedent, on the ground that the document offered for probate was not the Will of decedent, in that "on July 23, 1962, and at all times prior and subsequent thereto, said decedent was in such a mental state that he was of unsound mind and memory and lacked the requisite testamentary capacity," and that the document "lacks the required attestation clause."[1] Answers to these objections were filed by Esterina Fata and the Town of Grimaldi, and by the Attorney General of California by virtue of his duty to participate in the proceeding "to protect the gift to charity." The Attorney General participated in the proceedings until the trial, at which time the appellants Fata and the Town of Grimaldi assumed the defense of the Will.

The contest went to trial on the issues stated in the pretrial conference order: "1. Did decedent have testamentary capacity when he executed the purported will dated July 23, 1964 [sic]? a. Were the provisions which the deceased requested to be placed in his purported will so requested

---

*Assigned by the Chairman of the Judicial Council.

[1]The absence of a formal attestation clause does not affect the validity of the will in the circumstances of this case. (*Estate of Pitcairn*, 6 Cal.2d 730, 732 [59 P.2d 90].)

because of insane or other delusions of the decedent? b. Does the history of the decedent indicate lack of testamentary capacity at the time of execution of such purported will?''

The jury returned a verdict that on July 22, 1962, John Nigro was not competent to execute the document as his last will and testament. Thereafter appellants moved orally for a judgment notwithstanding the verdict on the ground that there was no evidence to sustain the verdict, and noticed a motion for a new trial. These motions were denied March 8, 1965, the court stating in its minute order: ''Though the issues of fact if submitted to the trial judge would have been resolved in favor of the validity of the will, the verdict of the jury as to insane delusion finds substantial support in the evidence. Motion for judgment notwithstanding the verdict is denied; motion for new trial is denied. (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689]; *Estate of Morgan,* 225 A.C.A. 199, 209 [225 Cal.App.2d 156 (37 Cal.Rptr. 160)]; *Estate of Lauth,* 180 Cal.App.2d 313, 317 [4 Cal.Rptr. 764].)'' Thereafter, judgment on the verdict was entered, that the Will was invalid, that decedent died intestate, and that contestant recover his costs.

### Sufficiency of the Evidence to Sustain the Verdict

Appellants' principal contention is that the evidence shows without substantial contradiction that at the time decedent executed his Will he had testamentary capacity. The jury found that he did not. ■ ''In a will contest, as in other cases, the credibility and weight of the evidence is for the trier of fact, and if there is substantial evidence to sustain the verdict or findings, an appellate court will not interfere.'' (*Estate of Watson,* 195 Cal.App.2d 740, 742 [16 Cal.Rptr. 125].) ■ ''The rule as to our province is: 'In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. ■ It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. ■ When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' (Italics added.) (*Crawford* v. *Southern Pac. Co.* (1935) 3

Cal.2d 427, 429 [45 P.2d 183].) . . .'' (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689].) ■ On appeal, ''all of the evidence must be examined, but it is not weighed. All of the evidence most favorble to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed.'' (*Estate of Teel,* 25 Cal.2d 520, 527 [154 P.2d 384].)

■ The determinants of testamentary capacity are whether, at the time of the execution of the will the individual '' 'has sufficient mental capacity to be able to understand the nature of the act he is doing, and to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument.' '' (*Estate of Fritschi,* 60 Cal.2d 367, 372 [33 Cal.Rptr. 264, 384 P.2d 656], quoting from *Estate of Smith,* 200 Cal. 152, 158 [252 P. 325].) ■ ''[T]esta-mentary capacity may be indicated by circumstances and conditions surrounding the testator both before and after the execution of the will, respectively, just as certainly, clearly, and unmistakably as by evidence of what was the general conduct and condition of the testator at the very instant the testator affixed his name to the instrument. . . .'' (*Estate of Ivey,* 94 Cal.App. 576, 587 [271 P. 559].)

■ The evidence in this case paints a rather bizarre picture of the drafting and execution of the purported Will. Decedent was released from the psychiatric ward of Menorah Hospital in Kansas City, Missouri, on July 13, 1962, and returned to his home in North Hollywood, California, the next day. Shortly thereafter, decedent twice asked Don W. Haynes, his insurance agent, who was not an attorney, to prepare a will for him, saying that his son, Frank, contestant here, had tried to have him committed and had taken money from him while in Kansas City. On that occasion, Haynes, who had known decedent since the 1940's, refused to prepare his will, reminding decedent that he had an attorney. On Sunday, July 22, 1962, decedent called Haynes to his apartment and again asked him to write his will ''that would cut out the people he wanted to cut out of his Will, and this had to be done but right now.'' Decedent again said he wanted to cut out his son because he had attempted to have him committed and had taken his money while in Kansas City. When Haynes first

refused to do so decedent was "pacing the floor, waving his arms and crying and in just a frantic frame of mind, and he said that he was fearful he might die that very night and that he couldn't die without putting on paper what he wanted done with his estate." Haynes testified that at that time, "I would say he was of unsound mind, most definitely." Haynes finally consented to write the Will after decedent assured him that he would "see an attorney the following day and have it done in legal form." Shortly after Haynes started typing the Will, Ralph Bernardo, a cousin of decedent, and his wife Marie came to the apartment without prior arrangement to visit him. Haynes testified that it took about two hours to type the document. During this time decedent and Ralph Bernardo had long discussions in Italian during which decedent would tell Haynes in English what he wanted in the Will and Bernardo helped Haynes with the spelling of the Italian names.

When the Will was completed Haynes said it needed two witnesses and asked the Bernardos to sign it. At first they both refused. As Bernardo testified: "I says, 'It no look to me the Will is any good.' And I says, 'No, we no going to sign.' But he was get wild because he bring a bottle of bourbon over there, drinking. . . . Himself, he takes a couple drink, see, and after he was worse. . . . Well, the only way I can describe, his eyes is all blood up, you know, just you can see all the blood, and he had the saliva here, and I figured up, I says, 'Well,' I told my wife, 'we might as well sign because if he is maybe going to break down he go back to Camarillo,' see." In response to a direct question, Bernardo also testified: "I don't think the way I see that day he was really sound mind. I think it was unsound mind. That is why we signed the Will, to quiet him down and please him." Marie Bernardo corroborated this testimony of her husband in all respects.
The opinions of the Bernardos and of Haynes, as intimate acquaintances of decedent, are entitled to some weight " 'over and above that which would follow, as a matter of necessary inference, from the reasons assigned' " for their opinions. (*Vitale* v. *Vitale*, 147 Cal.App.2d 665, 670 [305 P.2d 690].)
There is also substantial evidence of the decedent's mental deterioration over a long period of years. Of course, such evidence was material "only because of its bearing on the question of the sanity of the testator at the time of the execution of the will. Its weight was for the jury to determine."

(*Estate of Baker,* 176 Cal. 430, 437, 438 [168 P. 881] ; *Estate of Kirk,* 161 Cal.App.2d 145, 150 [326 P.2d 151].) The record shows that in December 1934, decedent was admitted to the Colorado Psychiatric Hospital from which he was finally discharged in August 1935. The medical diagnosis at that time was "mania depressive psychosis, alternating phases." Mena Nigro, a former wife, testified that when decedent returned from a two-year visit to Italy in 1954 he told her that he had been in a mental institution while there. In September 1955 he was admitted to Camarillo State Hospital, California, as a mentally ill person. While there the diagnosis was "schizophrenia reaction, schizo-affective type." A certificate of recovery was issued in September 1956. In November 1962, several months after the execution of the Will, decedent was admitted, at his own request, to the Madre de Vida Institute in Tarzana, California, where his illness was diagnosed as "involutional psychotic reaction, depressive type." He left this institute two days later against the advice of his attending physician and the hospital administration. Appellants make no showing that the court erred in permitting the contestant to elicit evidence concerning these commitments.

The jury also had before them the testimony of several doctors who had had the occasion to observe decedent. Dr. J. A. Nigro (no relation to decedent) of Kansas City met decedent in January 1962 and with his uncle, Dr. D. M. Nigro (no relation to decedent) cared for decedent until April 2, 1962, during his hospitalization for surgery for the removal of a cancerous growth in his abdomen. These doctors treated him after his release from the hospital and were responsible for his commitment to Menorah Hospital on June 9 for psychiatric care because of his mentally confused and irrational condition. Both of these doctors testified that in their opinion decedent was of unsound mind. Dr. Magalif, the psychiatrist who treated decedent on that occasion died before the trial of the case, and was not available as a witness. Dr. Higginbotham, who examined decedent in November 1962, diagnosed his case as "involutional psychotic reaction, depressive type" and testified that when he left the hospital after a two-day stay he still needed psychiatric care.

Appellants contend that the judgment should be reversed because contestant not only failed to establish that decedent was a person of unsound mind, but was equally unable to establish that on July 22, 1962, decedent was acting under an

"insane delusion" as that term is defined in *Estate of Alegria,* 87 Cal.App.2d 645 [197 P.2d 571], and the cases there discussed. The court there held (p. 654) that the possession of an insane delusion which leads a testator to dispose of his property otherwise than he would have done had he not possessed such insane delusion is sufficient to invalidate a will. ▆▆ As defined in *Estate of Putman,* 1 Cal.2d 162, 172 [34 P.2d 148], an insane delusion is "the conception of a disordered mind which imagines facts to exist of which there is no evidence and the belief in which is adhered to against all evidence and argument to the contrary, and which cannot be accounted for on any reasonable hypothesis. ▆▆ 'One cannot be said to act under an insane delusion if his condition of mind results from a belief or inference, however irrational or unfounded, drawn from facts which are shown to exist.' (*Estate of Scott,* 128 Cal. 57, 62 [60 P. 527].) . . ."

▆▆ The evidence shows that on July 22, 1962, testator was acting on the unfounded belief, at times rather violently expressed, that while he was in Kansas City earlier that year his son, Frank, was taking his money from him and was trying to have him permanently committed to a mental hospital in order to gain complete control over his estate, and that this belief was "adhered to against all evidence and argument to the contrary."

It would serve no useful purpose to review here the other evidence produced by contestant. To borrow the language of *Tangora* v. *Matanky,* 231 Cal.App.2d 468, 471 [42 Cal.Rptr. 348], "Appellants' review of the evidence lacks the objectivity with which we must view it and to a considerable degree deals with conflicts in evidence. As Witkin puts it (3 Witkin, Cal. Procedure (1954) p. 2250) : 'The test . . . is not whether there is substantial conflict, but rather whether there is *substantial evidence in favor* of respondent.' " On our review of the record as a whole we hold that there was substantial evidence, sufficient as a matter of law, to sustain the verdict in favor of the contestant.

Appellants also contend that the trial court erred in rejecting their defense of *res judicata* as to all alleged acts claimed to establish that deceased was incompetent at times prior to, at the time of, and after he was found to be competent in the probate court in Kansas City on July 13, 1962. There is no merit in this contention. ▆▆ The "order and judgment" of the probate court of Kansas City on July 13, 1962, does no more than raise a disputable presumption, subject to contra-

diction by competent evidence, that as of that date decedent was not incompetent and was capable of managing his property. (*Estate of Baker,* 176 Cal. 430, 436 [168 P. 881].) Neither the issues nor the parties in the Kansas City proceedings are the same as those involved here.

■ Finally, appellants contend that the trial court erred in refusing to give their requested instruction No. 1, based on the provisions of Probate Code section 41. The refusal to give this instruction was not error. (*Estate of Martin,* 170 Cal. 657, 672-673 [151 P. 138].)

### *Costs*

The judgment entered March 23, 1965, provided that contestant should recover his costs in the sum of $2,153.95.

■ The award of costs by the trial court was error. Section 1232 of the Probate Code provides that ''either the superior court or the court on appeal, may, in its discretion, order costs to be paid by any party to the proceedings, or out of the assets of the estate, as justice may require.'' ''[T]he [trial] court should not exercise its discretion and award costs until final determination of the contest. Thus it should not make an award where an appeal is taken.'' (*Estate of Jamison,* 41 Cal.2d 1, 14 [256 P.2d 984].)

We have concluded, in the exercise of our discretion, that contestant's costs in the trial court should be paid out of the estate.

The appeal from the orders denying appellants' motions for judgment notwithstanding the verdict and for a new trial is dismissed.

The judgment is modified to read, in part, that contestant shall recover from the estate his costs and disbursements in the sum of $2,153.95, and as so modified the judgment is affirmed. Appellants to bear their own costs on appeal. Respondent's costs shall be paid by the estate.

Herndon, Acting P. J., and Fleming, J., concurred.

A petition for a rehearing was denied July 19, 1966, and appellants' petition for a hearing by the Supreme Court was denied August 17, 1966.