[Civ. No. 24713.   First Dist., Div. Three.   Mar. 10, 1969.]

Estate of ROY A. MARTIN, Deceased. BOB LYNN ED- WARDS, Petitioner and Appellant, v. WAYNE STAN- LEY MARTIN, Objector and Respondent; FRANCIS J. McLAUGHLIN, Claimant and Appellant.

Watson, Hoffe & Fannin, Cannelora & Wright, Price, Burness & Price and Francis A. Watson, Jr., for Petitioner and Appellant and for Claimant and Appellant.

Carlson, Collins & Bold, Frederick G. Cole and Cyril Viadro for Objector and Respondent.

DAVID, J. pro tem.*—Decedent Roy A. Martin, widower, died in Napa State Hospital May 10, 1965. A will signed by him on October 10, 1963, was offered for probate by Bob Lynn Edwards, designated as executor therein. Attorney Edwards, who had probated Mrs. Martin's will in 1962, and Francis McLaughlin, a bank officer acquainted with Martin in that business capacity only, were the sole legatees named therein. This will was denied probate after a contest brought by Wayne Martin, decedent's nephew and sole heir at law, who was the sole beneficiary and executor of a 1962 will executed by Roy A. Martin. Under appropriate instructions, the jury, after a long trial, found that Roy A. Martin was of unsound mind and lacked testamentary capacity when he signed the October 10, 1963 instrument. Though the evidence would have permitted a contrary conclusion, there is substantial evidence to support the findings of the jury, and the judgment therefore is affirmed.

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

Upon this appeal, we are limited to a determination whether there was such substantial evidence, contradicted or uncontradicted, to support the verdict of the jury, and the judgment of the trial court. Hence "it would be but an idle act to attempt a review of evidence in conflict with that offered by respondents." (*Estate of Llewellyn* (1948) 83 Cal. App.2d 534, 543 [189 P.2d 822, 191 P.2d 419]; see also *Estate of Teel* (1944) 25 Cal.2d 520, 526 [154 P.2d 384]; *Estate of Lauth* (1960) 180 Cal.App.2d 313, 317 [4 Cal.Rptr. 764]; *Estate of Collin* (1957) 150 Cal.App.2d 702, 711 [310 P.2d 663]; *Estate of Watson* (1961) 195 Cal.App.2d 740, 742 [16 Cal.Rptr. 125].)

Testamentary incapacity because of unsoundness of mind is either insanity of such broad character as to establish mental incapacity generally, or a specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion which directly affected the testamentary act. (*Estate of Smith* (1926) 200 Cal. 152 [252 P. 325]; *Estate of Leonard* (1949) 92 Cal.App.2d 420 [207 P.2d 66]; *Estate of Alegria* (1948) 87 Cal.App.2d 645 [197 P.2d 571]; *Estate of Lingenfelter* (1952) 38 Cal.2d 571 [241 P.2d 990].)

In this case, there is substantial evidence to support a conclusion that both forms existed when Roy Martin executed the rejected will on October 10, 1963.

The possession of insane delusions which led Roy Martin to dispose of his property, otherwise than he would have done without such delusions, is sufficient to invalidate the instrument of October 10, 1963 as his will. (*Estate of Nigro* (1966) 243 Cal.App.2d 152, 160 [52 Cal.Rptr. 128].)

The jury's determination also is supported by substantial evidence of general unsoundness of mind extending over the period during which the rejected will was executed. This evidence was material "only because of its bearing on the question of the sanity of the testator at the time of the execution of the will. Its weight was for the jury to determine." (*Estate of Baker* (1917) 176 Cal. 430, 438 [168 P. 881]; *Estate of Kirk* (1958) 161 Cal.App.2d 145, 150 [326 P.2d 151]; *Estate of Nigro, supra,* 243 Cal.App.2d 152, 158.)

There was substantial evidence from which the jury could validly conclude that the October 10, 1963 will resulted from the unfounded delusions of Roy Martin that Wayne Martin was planning to put him into a mental institution in order to get all his money; that Edwards and McLaughlin would see

to it this would not happen, would attend him any time he called, and would take him for rides. Roy Martin attributed this belief of his to information supplied by Edwards. Such belief was adhered to, despite the manifest evidence to the contrary. Mr. McLaughlin disclaimed any such conversations ever took place, and Mr. Edwards' testimony indicates that he never made such representations or promises to Roy Martin.

In this will contest, the statements made by Roy Martin concerning Edwards' representations were the basis of the undue influence charge. The jury's special verdict negativing undue influence impliedly finds the delusional character of this belief that Martin acted upon in executing his October 10th will. Roy Martin also came to believe that his mother had been killed by Wayne Martin, who was not yet born at the time of her death from natural causes. As this mental deterioration and disorientation progressed, Roy Martin, because of these delusions, became bitter towards Wayne Martin.

In December 1964, Roy Martin disappeared while Wayne Martin and family were away on vacation. The police found him, and he was placed in the psychiatric ward of the Martinez County Hospital, from whence he was committed to Napa State Hospital. When there, he did not recognize Mr. and Mrs. Wayne Martin when they visited him. They were not responsible for the ultimate commitment.

Mrs. Vera Hurst, landlady for the Roy Martins, testified that as of 1962 and prior thereto Roy would "say nothing but the best" about Wayne Martin and his family; that he was very fond of their children. There was other testimony of like import.

The evidence amply supports the jury's implicit conclusion there were no factual grounds for the delusional erosion of Roy Martin's previous love and affection for his nephew and heir, Wayne Martin. His constant concern and continual attention to Roy and his welfare was manifest throughout the last several years of his life.

Dr. Walter Rappaport was an unusually qualified witness. He had been licensed as a physician since 1920; served on the psychiatric faculty of Northwestern University Medical School 1926-28; was on the staff of Mendocino State Hospital 1928-29, and was its superintendent and medical director 1939-41, 1946-47. He was superintendent and medical director of Agnew State Hospital 1957-65; and director of mental hygiene for the State of California 1953-57. He also engaged

in private psychiatric practice, and also was on duty as a Navy psychiatrist. He defined and described senile dementia, stating it was "characterized by poor memory, by confusion, by fabrication in their own mind, believing things which are not true . . . They believe there is something they're trying to do them out of—trying to harm them . . . they live in the past." He testified senile dementia was a progressive, irreversible thing, that 15 to 40 percent of the state hospital patients suffer from it, that it results from degeneration of brain tissue; this produces delusions and loss of memory for events of the present.

He reviewed the hospital records of Roy Martin from the Alameda County (Highland) Hospital and the Napa State Hospital. Based upon records, research material, and other testimony given at the trial he gave as his opinion that Mr. Martin suffered from arteriosclerotic senile dementia. Dr. Rappaport described the behavior associated with such disease. The effects so described tallied to a marked degree with items of Mr. Martin's aberrant behavior described by the percipient witnesses. After being given a further hypothetical catalog of conduct culled from the previous testimony, he was asked "Would you be able to give a mental—opinion as to his mental condition on October the 10th, 1963?" His answer was, "In my opinion, at the time of the writing of this will, the decedent in this case was so mentally ill that he did not have knowledge and appreciation of what he was then doing or what the results of what he was doing would be. . . ."

Counsel interrupted with the objection that the witness "is entitled to give his opinion as to the soundness or unsoundness of the man's mind, but he is not entitled to get into the areas of testamentary capacity."

The court accordingly struck this testimony. Dr. Rappaport, pursuant to permitted interrogation, then gave as his opinion that Martin was of unsound mind, continuously, for a matter of months before the signing of this will, and afterward until his death, assigning his reasons. "For all those reasons, I am of the opinion that the decedent, at the time of the making of the will, and for some time continuously prior thereto and thereafter, was of unsound mind."

Appellants contend that the entire testimony of Dr. Rappaport should have been stricken, as invading the province of the jury; that they did not have a fair trial, in that they could not examine Dr. Rappaport's premise by cross-examination, because that process would have revealed his

basic conclusion that decedent lacked testamentary capacity; all to their prejudice.

Appellants' premise is invalid. In *Estate of Russell* (1922) 189 Cal. 759, 774 [210 P. 249], the court stated: ''There is no merit in the contention that the objection should have been sustained because the question invaded the province of the jury by calling upon the [expert] witness to determine the ultimate question in issue.''

The expert alienist there, as here, had been asked hypothetical questions based on evidence in the case. Those questions (*id.* p. 772) directly called for opinions as to decedent's mental capacity as to each of the testamentary facts.

That court (p. 774) went on to state: ''This question when answered by the witness still left for the determination of the jury at least all of the following questions: (1) the credibility of the witness, (a) as to his skill and learning, (b) as to his honesty, impartiality and fairness; (2) as to whether or not each of the assumed facts had been proven; (3) as to whether or not the facts assumed had been fairly selected from among the facts proven; (4) as to whether or not material facts omitted from the question had been proven.''

In *Estate of Sexton* (1926) 199 Cal. 759, 769 [251 P. 778], the expert opinion there relied upon was held to be insufficient because the doctor had not ''given an opinion respecting the testatrix's ability to understand those concrete facts the understanding of which the law makes requisite to a capacity to make a valid will,'' citing *Estate of Russell, supra,* 189 Cal. 759.

Appellants rely upon *Estate of Rich* (1947) 79 Cal.App.2d 22, 32 [179 P.2d 373]. But the ruling in that case (p. 33) was simply to the effect that the testimony of the alienist did not establish the fact that the insanity definitely affected the testamentary act. The case also concerned lay witnesses called under Code of Civil Procedure section 1870, subdivision 10 as ''intimate acquaintances.'' The case held they could not validly express their opinion whether or not the decedent ''was mentally competent to make a valid will.'' (*Id.* p. 25.) The quotation in that case (p. 32) from *Estate of Dolbeer* (1906) 149 Cal. 227, 243 [86 P. 695, 9 Ann.Cas. 795] to the effect that the expert testimony of a skilled alienist is ''the weakest and most unsatisfactory'' evidence of steadily decreasing value, is dicta. No doubt this reflected the uncertain state of psychiatry as a part of medical science in 1906, and its then uncertain public acceptance. During the sixty years since, the multitude of cases relying on such testimony

rebut the characterization then made. The weight of such expert testimony is entirely a matter of fact, rather than of law, for determination of the jury. (*Estate of Balke* (1902) 136 Cal. 306 [68 P. 827, 89 Am.St.Rep. 135], in which an instruction to the same effect as the dicta of *Estate of Dolbeer, supra,* 149 Cal. 227, 243, was held to invade the province of the jury as to matters of fact; *Estate of Reed* (1955) 132 Cal.App.2d 732, 735-736 [282 P.2d 935]; *People* v. *Tucker* (1948) 88 Cal.App.2d 333, 340 [198 P.2d 941]; *People* v. *Markham* (1957) 153 Cal.App.2d 260, 271 [314 P.2d 217]; *People* v. *Hecker* (1960) 179 Cal.App.2d 823, 827 [4 Cal.Rptr. 334]; *Francis* v. *Sauve* (1963) 222 Cal.App.2d 102, 119 [34 Cal.Rptr. 754].)

██ Appellants assert prejudicial error because BAJI instruction 33,[1] relative to weighing expert testimony, was not given. Not having requested it, appellants cannot complain now. (*Ornales* v. *Wigger* (1950) 35 Cal.2d 474, 479 [218 P.2d 531]; *Hardy* v. *Schirmer* (1912) 163 Cal. 272, 275-276 [124 P. 993]; *People* v. *Fowler* (1918) 178 Cal. 657, 663 [174 P. 892]; *Sherman* v. *Kirkpatrick* (1927) 83 Cal.App. 307, 312 [256 P. 570]; *Douglass* v. *Webb* (1962) 209 Cal.App.2d 290, 303 [26 Cal.Rptr. 60].)

In the absence of such request, the court was not required to give the instruction on its own motion. The only "mandatory" instructions are set forth in Code of Civil Procedure section 2061. But even a failure to give them is not a ground for reversal, if the trial judge was not requested to do so. (*Flynn* v. *Young* (1938) 25 Cal.App.2d 614, 620 [78 P.2d 245].)

Proponents' instruction 12 [BAJI No. 33-C] covered the question, without elaboration.[2]

---

[1]"The rules of evidence ordinarily do not permit the opinion of a witness to be received as evidence. An exception to this rule exists in the case of expert witnsses. A person who by education, study and experience has become an expert in any art, science or profession, and who is called as a witness, may give his opinion as to any such matter in which he is versed and which is material to the case. You should consider such expert opinion and should weigh the reasons, if any, given for it. You are not bound, however, by such an opinion. Give it the weight you deem it entitled, whether that be great or slight, and you may reject it, if in your judgment the reasons given for it are unsound."

[2]"In examining an expert witness, such as a psychiatrist, counsel may propound to him a type of question known in law as a hypothetical question. By such a question the witness is asked to assume to be true a hypothetical state of facts, and to give an opinion based on that assumption. In permitting such a question, the court does not rule, and does not necessarily find even in its own mind, that all the assumed facts have

514

■ Proponents' instruction 13, insofar as it stated "You are instructed the hypothetical opinion of an alienist does not take precedence over the opinions of subscribing witnesses to a will or the opinions of intimate acquaintances" was erroneous. This was based, no doubt, on *Estate of Dolbeer, supra,* 149 Cal. 227, 243, which already has been discussed. Under the circumstances, any asserted confusion of the jury on the subject was self-invited and cannot be relied upon by appellants as prejudicial error.

■ As of September 1966, when the case was tried, Code of Civil Procedure section 1870, subdivision 10 [now Evid. Code, § 870, not in effect at the time of this trial] provided that evidence may be given on a trial of the following facts: "10 . . . the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given." The Supreme Court in *Atkins Corp.* v. *Tourny* (1936) 6 Cal.2d 206, 209-213 [57 P.2d 480], discussed the meaning but gave no firm definition of who was an "intimate acquaintance." In this case, appellants' contention that Frank E. Loher, accountant, whose testimony is outlined, *infra,* was not such an "intimate acquaintance" cannot be sustained. For six years Loher was Roy Martin's supervisor in their employment. After Martin retired, Loher for several years prepared Martin's income tax returns. Though their later contacts were few, Loher, by virtue of his earlier intimate contacts, was qualified to testify as to the progressive mental degeneration of his friend. (*Estate of Dalrymple* (1885) 67 Cal. 444, 445 [7 P. 906]; *Lamb* v. *Wilke* (1912) 19 Cal.App. 286, 289 [125 P. 757].)

■ *Estate of Llewellyn, supra,* 83 Cal.App.2d 534, 543, states the undoubted law that "substantial evidence" is required to overturn the verdict of the jury in a will contest. Appellants assert this case establishes also the doctrine that substantial evidence is required to overcome a purported

been proved. It only determines that those assumed facts are within the probable or possible range of the evidence. It is for you, the jury, to find from all the evidence whether or not the facts assumed in a hypothetical question have been proved, and if you should find that any assumption in such a question has not been proved, you are to determine the effect of that failure of proof on the value and weight of the expert opinion based on the assumption. Failure to prove a fact assumed in a hypothetical question may make the opinion based on it entirely worthless, or the opinion may, nevertheless, have weight and value, depending on the relationship of such assumed fact to the issues of the case, the facts proved and the expert opinion. In respect to such a matter, you will apply your own reasoning to the end of drawing a conclusion that will be just and sound.''

testamentary act of a decedent. Appellants erroneously assert that the failure to give appellants' proposed instruction 32 to that effect was reversible error.

A trial court on motion for nonsuit or for a new trial, or an appellate court is to consider whether there is "substantial evidence" which reasonably supports the verdict or judgment rendered. (*Fewel & Dawes, Inc.* v. *Pratt* (1941) 17 Cal.2d 85, 89 [109 P.2d 650]; *Estate of Boggs* (1942) 19 Cal.2d 324, 328 [121 P.2d 678]; *Estate of Callahan* (1967) 67 Cal.2d 609 [63 Cal.Rptr. 277, 432 P.2d 965].) But the trial jury *ipso facto* covers the same ground in resolving conflicts and finding the facts. The jury could not be instructed regarding "substantial evidence" without defining it in terms of the controversy before it, which would tend to lead to invasions of its functions.

We have rejected the contention that there was "no evidence introduced in this case of any substantial nature indicating that at the time of the execution of the will on October 10, 1963 Roy A. Martin was not of sound and disposing mind and memory." If reasonable men differ fairly as to whether certain evidence establishes a fact in issue, it is "substantial evidence." (*Smith* v. *Schumacker* (1938) 30 Cal. App.2d 251 [85 P.2d 967].)

The evidence stated in numerous reported decisions respecting will contests, cumulatively presents a sad treatise on the causes, stages, and catastrophic final effects of senile dementia. There is a curious common similarity in the case histories of aberrant conduct, bizarre delusions, and the irreversible arteriosclerotic decay of brain tissue.

So here. Testimony was given by intimate friends and acquaintances of the deceased, who had known and observed Roy Martin for long periods of time. Mrs. Florence Robertson knew him for over 50 years. It is sufficient to summarize some of this testimony.

In March 1962, Roy Martin had been retired for some 10 years. Both he and his wife were in a convalescent home. At that time he was childish, senile, confused, of unsound mind. He couldn't think for himself. He couldn't remember where he was nor what he was supposed to be doing. Then, as later, he would sit immobile in a chair, hard to arouse from his trance-like state. He was a hypochondriac. In this period, he failed to recognize persons, and confused them with others; even on one occasion in that year insisting after identification

that his old friend Mary Rosenlund was Peggy, wife of his nephew Wayne.

From 1962 to the date of his death, his condition and delusional state worsened.

Mrs. Martin died in 1962. Thereafter on three occasions, he attempted suicide. Upon two of these he took an overdose of sedatives and was hospitalized. The first was in October 1962, when he went to Kaiser Hospital. Witnesses indicated that after this, he exhibited steady progressive mental deterioration and disorientation. He was not of sound mind thereafter. He was also in Highland Hospital. After Roy Martin left Highland Hospital, he complained he was held prisoner. He accused an orderly of boiling him in hot water, and of stealing his watch (though he had it on his wrist when he left the hospital). He told several witnesses that colored people were killing each other in the living room of his apartment, and were "having affairs" in an adjoining bedroom. Roy Martin, though truly asserting he had been married 50 years, yet claimed his wife was only 50 years old when she died. He hoarded medicine and Energine bottles, mostly empty. He kept a rock in a plastic cottage cheese container. Sometimes Wayne Martin would find this in the refrigerator, or the cupboard in the kitchen, and he objected when Wayne tried to take the rock. Roy claimed many times he had an estate over $700,000, a gross exaggeration according to the exhibits in evidence. He claimed he was the president of Standard Oil Company; once, of Union Oil Company. He disappeared one day. Upon his return he was asked if he had trouble getting home. Roy Martin said "Oh, no, I had no trouble getting home. I got on the bus and flashed my badge and I told them I was chasing an escaped convict and you have to get me to Richmond immediately."

Roy Martin offered matrimony to many women. He didn't go to his wife's funeral. He proposed marriage to Mrs. Robertson the day Mrs. Martin passed away. A lady conducting a telephone survey called Roy Martin, and he then asked her to marry him. She told Wayne Martin of the incident.

Roy Martin asserted to several people that Negroes visited his house on various occasions, beating him up. The Richmond police were called, but no foundation for such a belief was ever found. He erroneously persisted in thinking someone had stolen some of his stock certificates, though a check of his safe deposit box showed this was not true. He accused all those associated with him of stealing from him.

In August 1962 he said he was leaving his property to Mr. and Mrs. Wayne Martin. Another time, he said he was going to leave his money to a Mrs. Roberts. On another occasion, he met a woman at the Greyhound bus depot, and he said she had had a hard life and he was going to leave his money to her.

In 1951 or 1952 Roy Martin belonged to the auxiliary police civil defense organization in Richmond, and was in the police department reserve to 1956. From 1962 onward he habitually wore parts of the uniform, including one of his four badges.

Another witness, public accountant Frank E. Loher, was the supervisor of Roy Martin at the Standard Oil Refinery for six years before Martin retired in 1952. He testified: In 1963 and 1964 Roy Martin's mental condition had deteriorated. Martin could not supply any information about his property or financial condition. Loher couldn't find out from him what money or property he had. Martin could not recall what had happened in regard to his stock, his annuity or Social Security in the previous years. In the early part of 1964 Roy was not of completely sound mind. In 1963 his mental condition was not good. He was only partly able to find his records. Loher had to help him with his records, more than with other clients.

Wayne Martin, the contestant of the will, testified that from March to October 1963, his uncle's mind had deteriorated completely. Roy Martin confused Wayne with Wayne's father (decedent's brother), and accused Wayne of killing Roy's mother, who had died a natural death. Roy had no memory. He could not remember from one day to the next that his nephew had visited him the previous day. Such visits were frequent. In his opinion, and that of Mrs. Martin, Roy Martin was of a completely unsound mind at the time the will of October 10, 1963 was executed.

In August 1963, Wayne Martin went to his uncle's apartment. Roy Martin was on the front porch partially clothed. A police car was just leaving. He said he was waiting for a Greyhound bus; ''I just ordered a Greyhound bus to pick me up and take me to Reno.'' He was out of his head.

About October 12, 1963, Wayne Martin again went to Roy's apartment. To him, Roy then said, in effect, you no longer have to take care of me; Mr. Edwards and Mr. McLaughlin were put on the will and your name was taken off, so you don't have to worry about me any longer; that Mr. Edwards had visited him and told him that Wayne was trying to have

him sent to Napa, and that Wayne was trying to obtain all of his money.

Wayne Martin testified that from 1959 through 1963, Roy Martin's frugal habits changed to those of being careless with money; he added strings of zeros to the sums on his checks. Roy both overpaid and underpaid his landlady, Mrs. Patrick, and accused her of stealing money from him at various times. On October 12, 1963, Roy was trying to sell his 1950 Buick for $5. On October 16, 1963, or thereabouts, Roy Martin again accused Wayne Martin of trying to send him to Napa and steal all his money.

It was Wayne Martin's opinion that Roy Martin began to be of unsound mind in 1961. From the time he went to Highland Hospital in October 1962 and after, Roy Martin was completely of unsound mind up to his death, including all of October 1963. After 1961, there was no period in which Roy Martin knew the nature and extent of his property, when he could accurately tell what stocks he had; in 1963, he falsely accused Mr. Edwards of taking his stock.

Dr. James H. Connelly was decedent's physician from January 1963 onward. He attended Roy Martin once at his home and saw him periodically some ten times thereafter at his office, including September 30 and October 14 and 21, 1963. After the first four visits, he concluded that decedent suffered from arteriosclerotic senile dementia; and that on those three dates, he was of unsound mind; he was disoriented all the times he saw him. Dr. Connelly related that although his office hours began at 11 a.m., decedent would come to his office at 8 a.m. and wait. This seemed unusual. Martin had abnormal reactions to normal activities. After coming to the office early, "he would turn and be angry because he waited so long," and on one occasion he said that if it happened again, "I'll urinate all over the walls." Quite a few times Roy Martin related bizarre experiences to Dr. Connelly. He told stories about being on guard duty in Piedmont and out at Standard Oil. Dr. Connelly thought he was not merely an elderly man who reminisced. He thought it rather peculiar Martin "would come in with his guard uniform."

When Roy was sent to Brookside Hospital by Dr. Connelly, the diagnosis was chronic heart disease. This was a syndrome of arteriosclerotic heart disease. The doctor testified arteriosclerosis such as this may or may not cause brain damage.

It is not the law that to overturn a will the evidence of unsound mind must relate specifically to the day of the

alleged testamentary act. (*Estate of Callahan, supra,* 67 Cal. 2d 609, 615-616, which involved a testatrix suffering from progressive senile dementia.)

Bob Lynn Edwards, as executor under the will denied probate, moved to have attorney's fees and costs allowed him for defense of the tendered will. Under that will, he was a benefitted party, subject to the doctrine of such cases as *Estate of Higgins,* 158 Cal. 355, 358-359 [111 P. 8]. Mr. McLaughlin, the other co-legatee, did not request his attorney's fees and costs.

The trial court properly denied the motion, since an appeal was pending. On this point, and others involved on this appeal, *Estate of Jamison* (1953) 41 Cal.2d 1, 14 [256 P.2d 984] and *Estate of Nigro, supra,* 243 Cal.App.2d 152, 161, are instructive.

Probate Code section 1232 provides that "either the superior court or the court on appeal, may, in its discretion, order costs to be paid by any party to the proceedings, or out of the assets of the estate, as justice may require." We have concluded in our discretion, appellants should bear their own costs and attorneys' fees on appeal. Respondents costs shall be paid by the estate.

The order denying costs and attorney's fees is affirmed. The portion of the judgment appealed from is affirmed.

Draper, P. J., and Brown (H. C.), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 8, 1969.