[Civ. No. 39464. Second Dist., Div. Three. Sept. 27, 1972.]

Estate of PEARLE P. ZALUD, Deceased.
JOE WITT, Petitioner and Appellant, v.
ROMAN CATHOLIC BISHOP OF FRESNO et al.,
Contestants and Respondents.

## COUNSEL

Alexander H. Schullman for Petitioner and Appellant.

Andrews, Andrews, Thaxter, Jones & Baxter, James F. Thaxter, Hubler, Burford, Moran & Quirk and John F. Quirk for Contestants and Respondents.

## OPINION

**THE COURT.**—This is an appeal from a judgment in a will contest entered pursuant to a special jury verdict finding that the will, dated October 12, 1969, offered for probate by appellant herein, Joe Witt, was not signed by the testatrix Pearle P. Zalud.

Decedent, Pearle P. Zalud, died February 4, 1970, at the age of 85. She left an estate estimated to be worth approximately $1,000,000. The purported will dated October 12, 1969, offered for probate by appellant Joe Witt was prepared on a printed Wolcott form, and left all of decedent's estate, except for $6,000, to Joe Witt, who was unrelated to decedent. As to the remaining $6,000, $3,000 was left to each of decedent's cousins, George and Earl Zalud. Contestants, respondents herein, were principal beneficiaries under a prior will dated October 1, 1967, and a codicil thereto dated July 26, 1969.[1]

The grounds for contesting the Witt will as revealed by the pleadings were lack of execution by the decedent, improper attestation, lack of testamentary intent and undue influence. However, after all the evidence had been presented and prior to submission of the case to the jury, contestants abandoned all grounds of contest except lack of execution by the testatrix and lack of attestation in the manner and form required by law.

On appeal appellant contends that the evidence was insufficient to support the verdict of the jury and that the admission of certain evidence constituted reversible error. The evidence presented in this matter was extensive, covering over 1,000 pages of transcript and including numerous exhibits. The rule for review of the evidence on appeal in a will contest is the same as in any other case. ■ The rule was amply set forth by

---

[1]Throughout the trial the 1967 will and the 1969 codicil were referred to collectively as the Charitable will because many of the provisions of said will and codicil contained charitable dispositions. The contested 1969 will was referred to as the Witt will. For convenience we shall retain these designations in this opinion.

the Supreme Court in *Estate of Teel,* 25 Cal.2d 520, at pages 526-527 [154 P.2d 384], wherein the court quoted *Estate of Bristol,* 23 Cal.2d 221, at page 223 [143 P.2d 689], as follows: " 'The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case. . . . ▮ The rule as to our province is: "In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. ▮ It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. ▮ When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court." (Italics added.) . . . The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict. The critical word in the definition is "substantial"; it is a door which can lead as readily to abuse as to practical or enlightened justice.' " The court in *Teel* noted further (25 Cal.2d at p. 527): "Of course, all of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." (See also *Estate of Martin,* 270 Cal.App.2d 506, 509 [75 Cal.Rptr. 911]; *Laymon v. Simpson,* 225 Cal.App.2d 50, 52-53 [36 Cal.Rptr. 859].)

▮ Applying the above rules to the instant case we have carefully reviewed all the evidence presented herein and have reached the conclusion that the evidence was clearly sufficient to support the verdict of the jury and the judgment entered pursuant thereto. A summary of some of the pertinent evidence will show the basis for our conclusion.

In the Witt will the witnesses shown are Joe Witt's brother, Marcus Witt, Jr., and Marcus Witt, Jr.'s son, Marcus Witt III.

Marcus Witt, Jr., testified that he visited decedent a day or two before October 12, 1969, at her home in Porterville. His visit was unsolicited by decedent and was without prior notice to her. Decedent asked him to return on Sunday, the 12th, but she gave no reason for her request and she said nothing about a will or about his bringing anyone with him.

On October 12, 1969, Marcus Witt, Jr., left his home in Bakersfield, picked up his son at his place of business, and they drove directly to

decedent's home. They arrived at decedent's home in Porterville at approximately 4 p.m. and found decedent in the back yard watering her garden. The three of them entered the back porch and sat down on some chairs around a small table. Decedent served tea and then produced the questioned will. Decedent said, "I made up my mind to give my will to your brother Joe." She asked Marcus Witt, Jr., to witness her will and he inquired as to the propriety of a father and son witnessing a will. Decedent said, "Just a minute. I'll check with the attorney." She went into "the other room" and was gone about three to four minutes. When she returned she said, "Very well and good for a father and son to witness a will." Decedent signed the will. Then Marcus Witt, Jr., and his son each signed the document as witnesses. When the Witts rose to leave, Marcus Witt, Jr., picked up the will and decedent said, "Oh, no. Let me keep this. . . . I'm going to give this to Joe myself."

Marcus Witt III corroborated his father's testimony in practically every detail. He testified to the statements purportedly made by decedent in language almost identical to that used by his father.

Joe Witt testified that he left his home in Bakersfield at approximately 1 or 2 p.m. on October 12, 1969, and drove to the town of Lindsay, 10 miles north of Porterville, to visit his sister-in-law and to visit his brother's grave in Exeter. After visiting his brother's grave and finding his sister-in-law not to be at home, he left to return to Bakersfield. He stopped at a public telephone in Porterville and called decedent. She asked him to stop by her house and "[c]ome around to the back." He did so and found her on the back porch. She went into her kitchen and returned with the questioned will and gave it to him. She had never said anything to him previously about mentioning him in her will and he did not know when he went to her house that his brother and nephew had been there earlier in the day. He did not discuss preparation of the will with decedent and at that time he had no knowledge regarding the matters of who had prepared the will, where the form had been obtained or whose typewriter had been used to type the will.

Testimony regarding preparation of the questioned will was sharply conflicting. Judith Ann Gibbons testified that sometime in September 1969, Joe Witt came into the office-machine shop operated by her and her husband in Porterville and requested that she type the questioned will on a blank will form which he supplied to her. She typed the will at the counter, a special service for customers provided by the shop. In typing the will she noticed that two signatures were already on the document, but she

could not recall whether one of them was Pearle P. Zalud. She testified that she had typed a carbon copy of the will on a similar will form.[2]

Joe Witt denied that he had ever been in Mrs. Gibbons' shop and that he had ever had anything typed by her.

Thelma Schaper testified that she had known decedent since about 1956 because decedent was a friend of her mother. She testified that decedent telephoned her at her home in Bakersfield on the morning of October 12, 1969. Decedent told Mrs. Schaper that Mrs. Schaper's mother had told her that Mrs. Schaper would do a favor for her. Decedent did not explain what the favor was. Decedent arrived at Mrs. Schaper's home about 30 to 45 minutes later in a private car driven by a man who sat in the car during the entire time that decedent was at Mrs. Schaper's house. Decedent brought a typewriter and some papers, including some blank will forms. She asked Mrs. Schaper to type a will for her on a form and Mrs. Schaper did so while decedent dictated the contents. When the typing of the will was completed, decedent signed it and Mrs. Schaper and her sister, Ruby Nord, signed as witnesses. Decedent then read over the will, became angry when she discovered errors in it, and demanded that Mrs. Schaper retype it on a second form which decedent had with her. When the second will was typed, decedent left without signing it.

Mrs. Schaper and Joe Witt had worked together at Lockheed from

---

[2]Appellant argues in his brief that Mrs. Gibbons' testimony was completely discredited and should have been stricken (although no such request was made at trial) because contestants' expert questioned-document examiners testified that the questioned will "was typed without a carbon." This contention is not supported by the record. The pertinent testimony will be noted.

The first questioned-document examiner presented by contestants was Mr. Harris. He testified initially as to the various ways in which a signature could be forged. He mentioned the method of tracing a true signature with a piece of carbon paper underneath, leaving slight carbon traces, and then filling in the tracing. On cross-examination appellant's trial counsel asked Mr. Harris: "Q. Did you check this for any trace of a carbon or anything like that? A. Yes. Q. Was there any? A. I didn't find any." The subject was not further pursued. Contestants' second questioned-document examiner, Mr. Mire, was asked a similar question on cross-examination by appellant's trial counsel and gave a similar answer. On redirect examination Mr. Mire was questioned as follows: "Q. Now, one further question, Mr. Mire. You stated I think in answer to a question by Mr. Jenkins [appellant's trial counsel] that you did not find any evidence of carbon. What were you referring to? A. Around the signature of Pearle P. Zalud on the will of October 12, 1969. Q. What would be the significance of that if you had found some traces of carbon? A. Well, I would say then that they had a signature above that and a carbon there and it was a tracing. Q. And were you referring at all to whether or not there had been a carbon copy made of the document when it was typed? A. No, I was not. Q. You did not find any—or you did not make any test for that? A. No, I did not."

Thus, there is nothing in the record to indicate whether a carbon copy of the questioned will was made other than Mrs. Gibbons' testimony as noted hereinabove.

1951 until 1954. In 1959, she and Joe Witt were married in Las Vegas, Nevada, but the relationship only lasted a matter of hours.

The resolution of the conflict in the testimony and the determination as to the credibility of the witnesses whose testimony has just been noted was a matter solely within the province of the trier of fact.

Contestants presented the testimony of three highly qualified questioned-document examiners, John J. Harris, Donn E. Mire and David A. Black, each of whom testified that in his opinion the signature on the Witt will was made by someone other than the decedent. Appellant countered with testimony of three other witnesses who qualified as experts, Albert Meakin, Ralph Bradford and Lowell Bradford, each of whom testified that in his opinion the signature on the questioned will was genuine. █ It is for the trier of fact to resolve such conflict among experts, and once it has done so its determination will not be disturbed on appeal. (*Bard* v. *Rose,* 203 Cal.App.2d 232, 236 [21 Cal.Rptr. 382]; *Sim* v. *Weeks,* 7 Cal.App. 2d 28, 37-38 [45 P.2d 350].)

█ Joe Witt testified that he had known decedent since about 1953 or 1954. Decedent had a house in Los Angeles on Manhattan Place as well as one in Porterville and she would live in one or the other for varying periods of time. Joe Witt worked in Los Angeles County, while maintaining his home in Bakersfield, from 1962 to 1969. He testified that "about 20 to 30 to 35 times" during the period of 1962 through 1968 he transported decedent from Los Angeles to her home in Porterville. He stated that he sometimes picked her up at her house in Los Angeles and sometimes at a place called Sandy's Cafe, and that sometimes she would go to the parking lot at Lockheed where he worked.

Six of decedent's friends, her attorney, her housekeeper and two of her cousins, testified that they had never heard decedent mention Joe Witt. Joe Witt is not mentioned in any of the letters of instruction that decedent left for use in case of her death.

Katherine Schnierer, a Los Angeles neighbor and one of decedent's closest friends, testified that she saw decedent daily when she was at her Los Angeles home. She testified that when decedent came to Los Angeles she would usually stay for a period of four to five months at a time and that she never took short weekend or overnight trips to Porterville. Mrs. Schnierer further testified that decedent never left for Porterville without informing her. Mrs. Schnierer knew that Albert Konda and Roy Boone transported decedent from Los Angeles to Porterville. She never saw Joe Witt pick up decedent. Sandy's Cafe was right around the corner from the Schnierer house. She never knew of decedent leaving for Porterville from

Sandy's Cafe "because how could she carry her birds and everything up to the cafe and leave from there? She was helpless." Nor did Mrs. Schnierer ever know of decedent going to the Lockheed parking lot in 1962 for the purpose of being taken to Porterville.

Contestants introduced 10 prior testamentary documents signed by decedent, the first being a 1925 document and the latest being the 1967 will and 1969 codicil to which reference is made herein as the Charitable will. The two earliest documents were holographic wills. The next eight were formal typewritten documents, all bearing evidence of having been prepared by an attorney. None of the prior wills was prepared on a printed form. None of the prior wills mentioned Joe Witt. After the death of decedent's sister, decedent's last four wills from 1962 through 1969 (aside from the Witt will) show a continuing pattern and plan to distribute the bulk of her property to various entities including the City of Porterville and the Roman Catholic church, to be used for charitable purposes, and to promote her lifetime interests in subjects such as music, roses and agriculture.

Mr. John A. Gilligan was decedent's attorney from 1962 until the date of her death. He prepared the four wills and the 1969 codicil signed by decedent prior to the Witt will. Decedent told Mr. Gilligan that she did not want her relatives to inherit her property. In the wills which he prepared for decedent there was no mention of either Earl or George Zalud.

Albert A. Roe was named as coexecutor of the Charitable will, along with Albert Konda and Pauline Sinarle. On January 27, 1970, some three and a half months after the date of the Witt will, Mr. Roe visited decedent in her home in Porterville at her request. On that occasion she asked him if he would be willing to act as coexecutor of her estate. She also asked him if he would see her attorney, Mr. Gilligan, in Los Angeles the following day because Mr. Gilligan had her will. She wanted Mr. Roe to read over the will and call her the next day to assure her that the will was in order. Mr. Roe complied with her request.

Albert Konda had known decedent for the last 25 years of her life. He either saw her or talked to her by phone every day from September of 1969 to the day of her death. In the first part of January of 1970, decedent told Mr. Konda that he was to be one of the coexecutors of her estate.

It is, of course, manifest that if Miss Zalud did in fact sign the Witt will under the circumstances to which Marcus Witt, Jr., and his son testified, she thereby exhibited a state of mind which included an intent to revoke her prior will of October 1, 1967, and the codicil thereto of July

26, 1969. But the statements of Miss Zalud to Mr. Roe on January 27, 1970, as related hereinabove, gave support to the inference that her then state of mind was that the will of October 1, 1967, and the codicil thereto had not been revoked. The same inference as to her state of mind was supported by Mr. Konda's testimony that in the first part of January of 1970 she told him that he was to be one of the coexecutors of her estate. Wigmore states (6 Wigmore on Evidence (3d ed. 1940) § 1736, p. 115): "The testator's declarations may be conceived as either directly *asserting his belief* (*i.e.* that he had or had not executed or revoked a will of certain contents), or as indirectly and circumstantially indicating such a belief; in the former view, they are admissible to evidence his state of mind, under the present Exception (*ante,* § 1731); in the latter view, they are admissible as circumstantial evidence to indicate his state of mind (*ante,* § 271). Having thus evidenced his belief or consciousness, we may infer from it (backwards in time) the doing of the act which produced that belief or consciousness (*ante,* § 176). In other words, by a double process of inference, from utterance to belief, and from belief to a preceding act, we argue that the testator did or did not execute or revoke." The reasoning of *Estate of Morrison,* 198 Cal. 1, at pages 11-13 [242 P. 939], is consonant with that of Wigmore. (See also *Estate of Thompson,* 44 Cal.App.2d 774, 776 [112 P.2d 937]; Witkin, Cal. Evidence (2d ed. 1966) § 571, pp. 545-546.)

In a case involving the question of whether a purported holographic will was a forgery, *In re Creger's Estate* (1929) 135 Okla. 77 [274 P. 30, 62 A.L.R. 690], the court stated (274 P. at p. 32): "Common reason would dictate that declarations of a testator as to the contents of his will or how he intended that his property shall descend at the time of his death, standing alone, are not admissible as direct evidence to prove or disprove the genuineness of the will; but that, in all cases where its genuineness has been assailed by other proper evidence, declarations are admissible as circumstances either to strengthen or weaken the contention that the instrument is genuine. The weight to be given such evidence is for the court or jury—under our procedure the court, as he is the trier of the facts in such cases. That such declarations are of a very persuasive character and may often throw appreciated light on a doubtful issue cannot be doubted. The fact that they may be manufactured, the strongest point against their admission, goes to the weight and not their admissibility.

"In view of these considerations, and especially in view of the manifest tendency of the courts of to-day to enlarge and extend, rather than restrict, the character of evidence that may be received, we prefer to follow that line of cases which hold that both the antetestamentary and posttestament-

ary declarations are admissible, in corroboration of other evidence tending to render it probable or improbable that the paper, the purported will, is valid."

In an annotation on the subject of the admissibility of a testator's declarations upon the issue of genuineness or due execution of a purported will (62 A.L.R.2d 855, at pp. 858-859), it is stated: "The apparent weight and trend of authority . . . is in favor of the admissibility of declarations of the alleged testator (both those made before and those made after the date of the purported will), on the issue of forgery of the will, at least where the issue is raised by other substantial evidence and proof of the declarations is therefore corroborative of other testimony." (See *Estate of Thompson,* 200 Cal. 410, 418 [253 P. 697]; *Samuel* v. *Hunter's Ex'x.,* 122 Va. 636 [95 S.E. 399].)

Since the verdict of the jury was sustained by substantial evidence that the Witt will was a forgery, the judgment presented for review must stand unless there was prejudicial error with respect to the admission of other wills as contended by the appellant Joe Witt.

The trial court admitted in evidence copies of the wills of two deceased women, Winifred M. Wells and Florence E. Sammons, over the objection of Joe Witt's counsel. Joe Witt was the principal beneficiary of the Wells will and Marcus Witt, Jr., was the principal beneficiary of the Sammons will.

Appellant claims that admission of the Wells and Sammons wills constituted prejudicial error. He asserts that they were irrelevant and highly prejudicial. As noted above, the evidence regarding the preparation of the Witt will was sharply conflicting. Each side presented a witness who swore that she had typed the will in question, Judith Ann Gibbons testifying that she had typed it at Joe Witt's direction and Thelma Schaper testifying that she had typed it at the decedent's direction. Joe Witt denied any knowledge as to the preparation of the Witt will, other than that he had learned one month prior to the trial that Thelma Schaper had typed it. The Wells and Sammons wills were very similar in form to the disputed Witt will. Each was on a Wolcott printed form. In each case the testatrix was an elderly woman. The Sammons will (dated April 15, 1960) left substantially all of Mrs. Sammons' property to Marcus Witt, Jr., who was also named executor therein; and contestants' expert witness David A. Black testified that in his opinion the Sammons will had been typed on Joe Witt's typewriter. The Wells will (dated October 2, 1968) contained provisions which were strikingly similar to those contained in the Witt will. Further, the Wells will was typed on a Wolcott printed form identical

to the one on which the Witt will was typed. The Wells will left the bulk of Mrs. Wells' property to Joe Witt and named him as executor. Marcus Witt, Jr., was one of the attesting witnesses to the Wells will.

The similarities of the three wills, together with the evidence which supported the inference that the Sammons will had been typed on Joe Witt's typewriter, tended to impeach Joe Witt's testimony that he had no knowledge as to the circumstances of the preparation of the questioned will and, together with other evidence hereinabove related, lent support to the inference that he did in fact have such knowledge. It is appropriate to note the trial judge's reasoning in the course of determining that the objection made on behalf of Joe Witt to the introduction of the Sammons and Wells wills should be overruled, the pertinent portion of the record being as follows: "THE COURT: We start out with the fact that these three wills are all on very similar Wolcotts' forms, two of them being on the same numbered form—the will in question and another will in which Joe Witt is named as a beneficiary—both on Wolcotts' Form 1670. Also we have a great similarity in the typewritten provisions which are put in on this form. Then we have counsel's statement that he will show that the Sammons will and the will in question are both on the—the Sammons will was on a typewriter owned by Joe Witt. . . . It seems to me that in view of this witness' testimony, and it's true—he is not on trial—but his credibility is on trial, and he has told us that he didn't know anything about what he was going up there for or that he didn't have anything to do with the preparation of this will, and it seems to me this is a material thing for the jury to consider in connection with his credibility. Also, inasmuch as, if we let all three in, we have certainly got some of these other things that are mentioned in Section 1101. It seems to me a proper matter for the jury to consider. I'm going to have to overrule the objection to both wills, and if you can suggest any proper limitation for the Court to state in allowing them into evidence, I will consider that proposed limitation. . . . We have got preparation, plan, knowledge. I think this is admissible both on the question of credibility of the witness and also under Section 1101 of the Evidence Code. I will have to overrule the objection to both wills, and it will be considered that you have a continuing, running objection to all questions asked in relation to both Exhibits 3 and 4 for identification, and that it's overruled without being repeated."

Irrespective of whether Joe Witt had committed any wrong insofar as either the Wells will or the Sammons will was concerned, his connection with each will supported the inference that he had knowledge of the availability of the Wolcott forms which could readily be used in the preparation of a will without recourse to the services of a lawyer. It was an unusual circumstance that in three instances he would have some relationship to

a will which was prepared on such a form, the named testator in each instance not being related to the principal beneficiary and provisions having been inserted in each form which contain striking similarities to provisions so inserted in one or both of the other will forms. Neither the industry of counsel nor the research of this court has uncovered a will contest proceeding presenting a closely similar factual situation. But, as aptly stated in *Mintz* v. *Premier Cab Assn.* (D.C. Cir. 1942) 127 F.2d 744, at pages 744-745 [75 App.D.C. 389]: "A jury may discount or disregard testimony which runs counter to normal experience. To show that it runs counter to normal experience tends to contradict it."[3]

■ Appellant Witt further contends that the trial court erred in permitting the introduction in evidence of prior wills of the decedent. But, as has been noted, if the Witt will dated October 12, 1969, was authentic, then its effect was to revoke the will of October 1, 1967, and the codicil thereto of July 26, 1969. That will and codicil provided for the disposition of Miss Zalud's property in a manner entirely inconsistent with the disposition designated in the Witt will. While the present case involves the question of whether the revoking instrument was a forgery, the relevancy of evidence of prior wills is of the same nature in this case as it is in a case where the issue presented is whether a missing will was destroyed *animo revocandi,* except that in the present case such evidence is corroborative of other evidence which bore directly on the issue of forgery of the decedent's signature. In *Estate of Ronayne,* 103 Cal.App.2d 852 [230 P.2d 423], wherein the issue was whether the missing will had been destroyed *animo revocandi,* this court stated at page 858: "The best evidence, if not the only evidence, that can be produced to rebut the inference of revocation, is that the testatrix for several years contemplated a certain disposition of her property; that when she disposed of that property by the will of 1947 her mental attitude was precisely the same that it had been during those previous years; and that after she made such disposition her mind remained in the same state practically until her death, supplemented by the consistency of her mental attitude toward her husband and the beneficiaries named in her will." There was no error in admitting the prior wills which showed the consistency of Miss Zalud's plan of disposition of her property. (See *Estate of Arnold,* 147 Cal. 583, 593 [82 P. 252]; *Estate of Morgan,* 225 Cal.App.2d 156, 170-171 [37 Cal.Rptr. 160].)

---

[3]At the oral argument, appellant's counsel contended that certain evidence relating to the Sammons and Wells matters was erroneously permitted to be introduced. However, a review of the record shows that the subject matter was introduced in the testimony of appellant and his brother offered on appellant's behalf and that no objection of substance was made in the course of the cross-examination of those witnesses.

To the extent that decedent's prior wills which were made before her sister's death were subject to objection because they were inconsistent with her four wills made in the ensuing period of 1962 to 1969 (prior to the questioned will), appellant Witt waived any objection specifically relating to the introduction in evidence of the earlier wills in that his counsel stated at the trial: "Well, if any of them go in, I want them all in."

Appellant Witt's contentions on this appeal as to error in the admission of evidence are untenable. The verdict of the jury was supported by substantial evidence. Consequently, the judgment must stand.

The judgment is affirmed.

A petition for a rehearing was denied October 20, 1972, and appellant's petition for a hearing by the Supreme Court was denied November 22, 1972.